## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY

|  |  |  |
|---|---|---|
| BOB BAFFERT, and BOB BAFFERT RACING STABLES, INC., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | 3:22-cv-123-RGJ |
| CHURCHILL DOWNS, INC., WILLIAM C. CARSTANJEN, and R. ALEX RANKIN, | ) | |
| Defendants. | ) | |
| | ) | |
| Serve: 600 North Hurstbourne Parkway, Suite 400, Louisville, Kentucky 40222 | ) | **Jury Trial Demanded** |

## COMPLAINT

COMES NOW the Plaintiffs, Bob Baffert ("Baffert") and Bob Baffert Racing Stables, Inc., by and through counsel, and hereby state as follows for their Complaint against the Defendants, Churchill Downs, Inc. ("CDI"), William C. Carstanjen ("Carstanjen"), and R. Alex Rankin ("Rankin"):

## PRELIMINARY STATEMENT

1. This is an action brought pursuant to 42 U.S.C § 1983; 15 U.S.C. §§ 1, 2, 15, & 26; the Fourteenth Amendment to the United States Constitution; and Kentucky State law, arising from actions taken by CDI and its officers and directors, including Carstanjen and Rankin, under the color of state law, which have unlawfully deprived and will continue to deprive Baffert of his right to due process of law guaranteed under the Fourteenth Amendment and of his right to participate in horseracing in Kentucky under Kentucky law. Specifically, Baffert maintains a right to enter horses in races and apply for stall occupancy at CDI-owned racetracks. CDI has, without legal authority and without any notice or opportunity to be heard, "suspended" Baffert's right to race horses on CDI properties, precluding him from practicing his chosen profession or using his license on CDI properties. CDI's actions also constitute an unlawful restraint on trade.

1

2.     Following the 147th running of the Kentucky Derby, Baffert-trained thoroughbred horse MEDINA SPIRIT, the winner, was reported to have tested positive for betamethasone, an anti-inflammatory drug that is commonly used as an approved therapeutic medication in the routine care of horses. Mistakenly believing that Baffert *injected* the horse with a "prohibited" medication, CDI immediately "suspended" Baffert from entering horses at any CDI racetrack and barred Baffert-trained horses from receiving qualifying points (earned on non-CDI racetracks) for subsequent runnings of the Kentucky Derby. On several occasions as the facts have developed, Baffert asked CDI for an opportunity to rebut the allegations. Each time, it denied those requests.

3.     The governmental agency that oversees horse racing in Kentucky, the Kentucky Horse Racing Commission (the "Racing Commission" or "KHRC"), regulates betamethasone in its injectable form: *betamethasone acetate*. Betamethasone acetate poses possible risks to a horse because it is injected directly into an articular joint and is subject to a mandatory fourteen-day standdown period in Kentucky. The Racing Commission does not regulate or prohibit betamethasone in its topical form, *betamethasone valerate*. Betamethasone valerate is a common, FDA-approved, ethical medication used to increase the efficacy of antibiotics and antifungal medications applied as topical salves or ointments. Betamethasone valerate solutions (typically with gentamycin) are commonly prescribed not only to horses but also to household pets like cats and dogs to treat skin, eye, and ear infections. Betamethasone valerate ointments are in the same class of medications available to humans for minor rashes and skin irritations associated with insect bites or contact with plants like poison oak, ivy, and sumac. Surprisingly, the Racing Commission's post-race testing did not distinguish between the two varieties of betamethasone. Subsequent scientific analysis on MEDINA SPIRIT's post-race biological samples, however, have definitively proven that the betamethasone detected in the post-race testing was from the topical

betamethasone valerate. The picogram-level amount (a picogram is one-trillionth of a gram) of betamethasone absorbed through the skin (as opposed to injected) is biologically irrelevant, has no potential to enhance a horse's performance, has no potential to mask joint pain, and poses no danger to the safety and welfare of the horse. Most importantly, whereas a finding of betamethasone acetate could serve as proof of a violation of the KHRC rules of racing, a finding of betamethasone valerate cannot.[1]

4.      On those facts, Baffert is currently availing himself of the legal regulatory system established by the Commonwealth of Kentucky, which makes this case about who gets to hold Baffert accountable, for what (if anything), and how. Baffert expressly agreed to cooperate with the *Racing Commission's* regulatory process when he entered horses at Churchill Downs and to submit to any penalties imposed after a final order issued by that body. Baffert's culpability, if any, will be determined in that forum. The first step of that process, an initial hearing before the stewards, occurred on February 14, 2022. CDI participated in that hearing by nominating Tyler Pickelsimer, a CDI employee, as one of the three stewards. The stewards recommended imposing a 90-day suspension and disqualifying Medina Spirit, which initiated the administrative adjudicatory process. The next step is a full evidentiary hearing before an administrative law judge, who will recommend a decision to the full board of the Racing Commission. A judicial appeal may follow. Although a final decision is pending, CDI's suspension purports to be independent of that regulatory process and is not contingent on its outcome.

---

[1] The Kentucky Rules of Racing hold a trainer strictly responsible for the presence of any substance in the horse "except as permitted in 810 KAR Chapter 8." 810 KAR 8:010 Section 2(2). The use of antiseptic/antifungal ointments is expressly permitted by 810 KAR Chapter 8 under a rule captioned "*Certain Permitted Substances*." 810 KAR 8:010 Section 4. A rule violation in Kentucky for the use of betamethasone is limited to a violation of the "restricted administration time" rule, which prohibits the *injection* of betamethasone acetate within fourteen days of a race. Betamethasone acetate is not covered by the exception for "products used in the daily care of horses" because it is injected. 810 KAR 8:010 Section 4(2).

5.      In this action, Baffert seeks, among other relief, a declaration pursuant to 28 U.S.C. § 2201, *et seq*., that CDI is prohibited from a) denying racehorses owned and/or trained by Baffert or those racing and/or training racehorses under Bob Baffert Racing Stables, Inc., entry into races contested at CDI racetracks, including, but not limited to, Churchill Downs, Oak Grove, and Turfway Park; b) denying Baffert the privileges of the grounds of the foregoing Kentucky racetracks; c) denying Baffert or those racing and/or training under Bob Baffert Racing Stables, Inc., stall space at Kentucky racetracks; d) prohibiting Baffert and/or any horse trained directly or indirectly by him and/or Bob Baffert Racing Stables, Inc., from earning points to qualify for the Kentucky Derby; and e) refusing to recognize qualifying points Baffert-trained horses have already earned for the upcoming Kentucky Derby.

6.      Baffert also seeks, among other relief, entry of a preliminary and permanent injunction enjoining CDI from further barring (either by denying entry or refusing to recognize qualifying points) him and those racing and/or training racehorses under Bob Baffert Racing Stables, Inc., into races contested at CDI racetracks, including but not limited to Churchill Downs, Oak Grove, and Turfway Park. If CDI is not immediately enjoined, Baffert will suffer immediate and irreparable harm.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Baffert's claims brought under 42 U.S.C. § 1983 pursuant to its original jurisdiction as set forth in 28 U.S.C. § 1331 and 1343. Baffert's claims arise under the Constitution and laws of the United States, and he alleges that an entity acting under color of Kentucky State law violated his civil rights protected under the Fourteenth Amendment to the United States Constitution.

8.      This Court has jurisdiction over Baffert's claims brought under 15 U.S.C. §§ 1, 2, 15, and 26 pursuant to its original jurisdiction as set forth in 28 U.S.C. § 1331, given that such claims arise under the laws of the United States.

9.      This Court has jurisdiction over this matter pursuant to its original jurisdiction as set forth in 28 U.S.C. § 1332. This is a civil action between parties of diverse citizenship, seeking relief and damages in excess of $75,000.

10.     This Court has supplemental jurisdiction over Baffert's state and common law claims by virtue of the provisions of 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Baffert's claims, set forth herein, have occurred and continue to occur within this district — specifically within the County of Jefferson.

## PARTIES

12.     Baffert is an individual and resident of the State of California who is a nationally recognized thoroughbred trainer at the top of his field. He has been a trainer for over 46 years, and the horses he has trained have won races at the highest level of the sport. His horses have won the Kentucky Derby seven times (contested over CDI operated Churchill Downs Park); the Preakness Stakes seven times; the Belmont Stakes three times; and Breeders Cup Races eighteen times. Of the thirteen American Triple Crown Winners in history, Baffert has trained two of them: AMERICAN PHAROAH in 2015 and JUSTIFY in 2018. Baffert has since won the Kentucky Derby with AUTHENTIC in 2020 and MEDINA SPIRIT in 2021 to push his record number of Triple Crown race wins to seventeen, including a record seven editions of the Derby. Through

early May 2021, Baffert has won more than 3,100 races, with purse earnings of $320,410,647 (the third highest of all time). Baffert was elected to the National Thoroughbred Hall of Fame in 2009.

13.     Baffert holds a license issued by the Racing Commission to enter horses into races and to apply for stall occupancy at all racetracks in Kentucky, including CDI racetracks. The stewards have recommended a temporary (90-day) suspension of his license, pending a full evidentiary hearing before an administrative law judge.

14.     CDI is a Kentucky for-profit corporation with its principal place of business at 600 N. Hurstbourne Pkwy, Suite 400, Louisville, KY, 40222.

15.     CDI is a licensed racing association under Kentucky law. It owns or leases three of the major racetracks in Kentucky: Churchill Downs, Turfway Park, and Oak Grove. Churchill Downs is the host track for CDI's annual flagship event, the Kentucky Derby. CDI also owns, operates, and/or leases racetracks in Illinois, Louisiana, Florida, Ohio, Maryland, and Pennsylvania.

16.     CDI conducts its business subject to the Racing Commission's strict regulations and under its supervision. It is an entity that is legally subservient to the Racing Commission in all respects relating to the management, operation, and regulation of race meetings, and it operates in Kentucky only because the Racing Commission has granted it a license to conduct pari-mutuel racing dates annually at its three Kentucky locations. By statute, CDI may host race meetings in Kentucky only if it holds a valid license issued by the Racing Commission to conduct thoroughbred racing. CDI and the Racing Commission delegate to each other responsibilities related to the actual conduct of hosting a race meeting to their mutual benefit. Through this arrangement, the relationship between the Racing Commission and CDI is deeply entwined, and CDI's actions with regard to Baffert cannot be considered "purely private."

17.     William C. Carstanjen is a New York lawyer and the Chief Executive Officer of CDI, whose registered address is 600 N. Hurstbourne Pkwy, Suite 400, Louisville, KY, 40222.

18.     R. Alex Rankin is the Chairman of the CDI Board of Directors, whose registered address is 600 N. Hurstbourne Pkwy, Suite 400, Louisville, KY, 40222.

19.     In addition to his position at CDI, Rankin is the Chairman for Sterling & Thompson, a firm that provides, among other products, insurance for equine operations.

20.     Rankin is also the founder of Upson Downs, a thoroughbred farm in Kentucky that breeds, owns, and markets thoroughbred yearlings. Rankin owns several thoroughbred horses, which he and members of his family (sometimes through partnerships or fictitious names) race at CDI racetracks and elsewhere for their personal financial profit. Horses bred at Upson Downs (in addition to other horses in which other officers, directors, and/or agents of CDI have a beneficial interest) compete with the progeny of Baffert-trained horses at yearling sales nationally.

## OPERATIVE FACTS

21.     Plaintiff hereby incorporates by reference paragraphs 1 through 20 above as though fully set forth herein.

### *Horse Racing in Kentucky*

22.     Horse racing is a century's-old tradition with a proud history in Kentucky. Kentucky racetracks host race meetings throughout the year. These race meetings are open to public viewing and, like any sport, are primarily for public amusement. In Kentucky, the Racing Commission permits the public (within certain parameters) to wager on the outcome of races. The Racing Commission likewise permits private racing associations (i.e., the licensed entities that host race meetings) to facilitate and profit from pari-mutuel wagering activities on race days.

23.     In the sport of horse racing, there are several types of races. One type is known as a stakes race, in which trainers and owners run their horses for a purse of prize money composed, in part, of entry fees paid by the owners and trainers. Other types are known as "overnight racing," such as a claiming race, in which a horse's owner must declare in advance of the race a price at which the horse will be offered for sale. Race meetings offer a venue for owners and trainers to compete for purse money, as well as provide a marketplace to sell horses for profit. Both types of races are structured to make horse racing, ownership, and training more competitive.

24.     Horse races are "graded" by the American Graded Stakes Committee of the Thoroughbred Owners and Breeders Association based on a number of criteria that reflect the importance of the race and the quality of the horses involved. Races are often delineated as Grade 1, Grade 2, and Grade 3 races, with Grade 1 being the most prestigious. Grading races is to provides a reference point for a particular horse's value based on its success in a given race. A horse's record in graded races likewise determines the value of the horse's progeny in the breeding market for Thoroughbred racehorses. In the words of the Thoroughbred Owners and Breeders' Association, "Horses winning these graded races may reliably be considered as superior racing stock, and the breeding stock producing them as superior breeding stock."[2] The Kentucky Derby has historically been a prototypical Grade 1 stakes race.

25.     The grading procedure is subject to strict criteria that make certain types of races ineligible for grading. One such ineligible race is a "restricted race." As the American Graded Stakes Committee has explained,

> Races will be ineligible for grading if conditions for competing in them include restrictive provisions relative to which horses may enter, other than by sex or age. A race is regarded as a restricted race

---

[2] https://toba.org/graded-stakes/

> if any of its conditions for entry would tend to exclude better horses
> while allowing participation by lesser horses.[3]

Changing which horses are eligible for a given race is a ground to reconsider and revoke that race's graded status.

<em><u>CDI and Churchill Downs Racetrack</u></em>

26.     CDI runs overnight entries and stakes races at Churchill Downs, Turfway Park, and Oak Grove (hereinafter, "CDI racetracks") on assigned days throughout the year.

27.     Baffert regularly entered horses in stakes and claiming races on CDI racetracks — particularly, the Churchill Downs racetrack.

28.     Rankin and his family members race horses in stakes and claiming races on CDI racetracks throughout Kentucky and elsewhere, including Churchill Downs.

29.     In the 2021 calendar year, the Racing Commission granted CDI the exclusive right to host race meetings for 154 days, which is more than half the total racing days allotted to all licensed racing associations in Kentucky.

30.     Although CDI operates a nominally private business at Churchill Downs racetrack, CDI does not own the track. In 2002, CDI transferred the title to Churchill Downs to the City of Louisville, Kentucky, which currently leases the property to CDI as a mere tenant on the grounds. The lease term is for thirty years and expires on December 31, 2032.

31.     The lease was part of a tax increment financing agreement between CDI, the Louisville/Jefferson County Metro Government, and the Louisville Development Authority (d/b/a Metropolitan Development Authority), for the redevelopment and expansion of the Churchill Downs Racetrack. The lease explains that the City advanced the funds to CDI for the express purpose of making horseracing and pari-mutuel wagering available to the public.

---

[3] *Id.*

32.     As part of the lease, the City designated the Churchill Downs racetrack as a "'recreation park' within the meaning of Chapter 103 of the Kentucky Revised Statutes." *See* K.R.S. § 103.200(1)(e).

33.     On June 11, 2002, the City of Louisville passed Ordinance No. 73 (Series 2002), which declared Churchill Downs "a unique asset of the City of Louisville, being both a world-famous cultural icon and a thriving business which contributes significantly to the economy of the City through employment, tourism, and tax dollars." The ordinance authorized the City to assume title to the Churchill Downs racetrack and create the "Churchill Downs Development Area."

34.     Under the terms of the lease and Churchill Downs's designation as a development area, the racetrack is exempt from taxation by the City "and other political subdivisions in Kentucky to the same extent as other public property used for public purposes."

35.     CDI also operates online wagering and casinos, several of which are connected to CDI racetracks. CDI owns, operates, and profits from the wagering platform, TWINSPIRES, that facilitates pari-mutuel wagering on races run on CDI properties, including the Kentucky Derby. Like race meetings, casinos situated upon CDI racetrack facilities require a license and are subject to extensive regulation and oversight. Typically, a state regulatory environment is established by statute and administered by a regulatory agency with broad discretion to regulate the affairs of owners, managers, and persons with financial interests in casino operations.

36.     The ownership, operation, and management of CDI's racing, online wagering, and gaming segments, as well as its other operations, are subject to regulation under the laws and regulations of each jurisdiction in which it operates. The ownership, operation, and management of CDI businesses and properties are also subject to legislative actions at the federal and state level.

*Racing Commission Oversight of Horse Race Meetings*

37.     Throughout the United States, individual states control the operations of racetracks located within their respective jurisdictions with the intent of, among other things, protecting the public from unfair and illegal gambling practices, generating tax revenue, licensing racetracks and operators, and preventing organized crime in horse racing. State regulation of horse races extends to virtually every aspect of racing and usually extends to details such as the presence and placement of specific race officials, including timers, placing judges, starters, and patrol judges.

38.     Horse racing tracks and horse race meetings in Kentucky are controlled and supervised by the Racing Commission, which is responsible for regulating the state equine industry and overseeing the annual licensing and operations of horse race meetings. K.R.S. § 230.215.

39.     The Racing Commission, in its sole discretion, authorizes a limited number of entities to race horses under restricted circumstances, under the personal supervision of Racing Commission agents, and under the Racing Commission's immediate control. All licensed horse racing must comply with the statutes and regulations governing horse racing. K.R.S. §§ 230.215 & 230.290(2).

40.     Private horse racing in Kentucky is outlawed as a public nuisance. K.R.S. §§ 230.215 & 230.290(2). Kentucky's prohibition against unlicensed, private race meetings began in 1906, when the Kentucky General Assembly established the Racing Commission (called the "State Racing Commission" at the time). The move came in response to racing's "moral laxity," including the pervasiveness of fraud, bribery, and "other pernicious practices." *See State Racing Comm'n v. Latonia Agric. Ass'n,* 136 Ky. 173, 123 S.W. 681, 684 (1909) (discussing legislative history). The ultimate concern with private horse racing was that its unhindered indulgence "would grow to be unlimited in its possibilities for mischief." *Id.* The General Assembly was faced with a

choice to prohibit racing altogether or to prohibit all races except those conducted by persons selected by the Racing Commission, during dates and times selected by the Racing Commission, and under conditions established by the Racing Commission. *Id.* at 685-86. The General Assembly elected the latter option and outlawed purely private racing as a public nuisance. *Id.*

41.     That general framework continues today; however, the Racing Commission's involvement in the actual conduct of racing has grown to be much more intimate: Kentucky law vests the Racing Commission with "forceful control of horse racing." K.R.S. § 230.215(2).

42.     Apart from marketing, facility maintenance, and financing, there is virtually no aspect of CDI's involvement with horse racing that the Racing Commission does not ultimately control.

43.     Today, as in 1906, the Racing Commission assigns racing days. 810 KAR 3:010 Section 5. Racing associations like CDI do not have the power to choose their own racing days and, therefore, do not have the power to select which days they conduct their nominally private business activities. When assigning racing days, the Racing Commission considers a number of factors, including "[w]hether the assignment of racing dates will maximize revenues to the state." 810 KAR 3:010 Section 5(7).

44.     The Racing Commission sets default and minimum purse values, must approve all proposed distributions of purses, can order purses to be redistributed, limits the number of races that can be held on association grounds on a given day, and requires certain types of races to be run each week. 810 KAR 2:070 Sections 31, 32, & 33; 811 KAR 1:040 Sections 1 & 7.

45.     The Racing Commission requires CDI to maintain Racing Commission office spaces, Racing Commission parking spaces, preferred parking for Racing Commission vehicles,

and a clearly marked "KHRC" season box for Racing Commission members at all CDI racetracks. 810 KAR 2:070 Section 10.

46.     The Racing Commission requires CDI to maintain an office space for a licensing administrator employed by the Racing Commission to accept applications for licenses on behalf of the Racing Commission during CDI-hosted race meetings. 810 KAR 2:010 Section 2.

47.     The Racing Commission requires CDI to maintain a "test barn" at all CDI racetracks to facilitate post-race collections of biological samples for testing. The test barn is a fenced enclosure under the supervision and control of the Racing Commission's Chief Racing Veterinarian. CDI personnel have no right to access the test barn except with the Chief Racing Veterinarian's permission or in the case an emergency (such as a fire). 810 KAR 8:010 Section 11.

48.     CDI is forbidden from materially altering the racetrack or any part of the grounds without the Racing Commission's prior written approval. 810 KAR 3:010 Section 9.

49.     The Racing Commission requires CDI to maintain security services on association grounds. 810 KAR 2:070 Section 20. CDI security must report any disturbances or disorderly conduct to the stewards and the Racing Commission Director of Enforcement, all of whom are Racing Commission agents. 810 KAR 2:070 Section 22(3)(a). The Racing Commission Director of Enforcement is a Racing Commission employee who participates and cooperates with CDI's track security on "investigations and conduct pertaining to racing." 810 KAR 2:010 Section 5. The Racing Commission Director of Enforcement acts under the direction of the stewards. 810 KAR 2:010 Section 5(3). CDI security must exclude from association grounds any person designated by the stewards to be denied access. 810 KAR 2:070 Section 20(3).

50.     The Racing Commission forbids CDI to allow any trainer to race who is not licensed to race or whose license to race has been suspended by the appropriate regulatory body in any jurisdiction. CDI must honor any license suspensions or revocations levied by the Racing Commission. 810 KAR 8:030 Section 2(16).

51.     As part of its forceful control over horse racing, the Racing Commission is "vested with jurisdiction *and supervision* over all horse race meetings in [Kentucky] and over all associations and all persons on association grounds." K.R.S. § 230.260 (emphasis added).

52.     The Racing Commission oversees racing first and foremost through three stewards (sometimes referred to as judges). The stewards exercise immediate supervision and control of racing at each licensed race meeting on behalf of and responsible to only the Racing Commission. 810 KAR 2:040 Section 4.

53.     The Racing Commission employs and compensates two of the three stewards for each race meeting. 810 KAR 2:040 Section 3(1). One is the Chief State Steward, an office currently held by Barbara Borden. The second is the State Steward, an office currently held by Brooks "Butch" Becraft. The Racing Commission employs no other stewards.

54.     The association hosting the race meeting (i.e., CDI) selects the third steward subject to the Racing Commission's approval. CDI is responsible for that steward's compensation, but the association steward is ultimately answerable to the Racing Commission. 810 KAR 2:040 Section 3(2); 810 KAR 2:010 Section 1.

55.     Horse racing in Kentucky is forbidden without the stewards' physical presence on association grounds on race day. All three stewards must be physically present at any CDI racetrack hosting a race before the first race, during each race, and until the final race's conclusion. 810 KAR 2:040 Section 5(2). At least one steward must be present at the racetrack from scratch

time. Further, at least one steward must be present at CDI racetracks when entries are first taken and until entries are closed. *Id.*

56.     Because the two stewards employed by the Racing Commission must be physically present at each race, only one race in Kentucky can lawfully occur at any one time.

57.     On race days, the stewards police the conduct of horse racing by calling fouls and determining rule violations. 810 KAR 4:040 Sections 12 & 13. The stewards can order the withdrawal of any horse at any time, inspect the horses and their riders prior to the race, can require jockeys to dismount, and can require horses to unload at the start gate. 810 KAR 4:040 Sections 4, 6, & 8. The stewards also issue the official order of finish for each race. 810 KAR 4:040 Section 17. But the stewards' powers and duties on race day go beyond that of mere referees.

58.     The stewards possess an absolute power to veto any decision CDI officials make "pertaining to racing." 810 KAR 2:040 Section 4(5). The stewards can also eject or exclude any person from CDI grounds, which necessarily includes the power to exclude CDI officers and directors. K.R.S. § 230.260(1).

59.     A number of assistant racing "officials" assist the stewards in discharging their supervisory and managerial roles. Some assistant racing officials include the racing secretary, an assistant racing secretary, a clerk of scales, paddock judges, starters, a placing judge, timers, identifiers, veterinarians, assistant starters, jockey room custodians, jockey room employees, valets, and outriders. Some of these officials are compensated by the Racing Commission, and others are compensated by the association. *See* 810 KAR 2:010 & 2:020.

60.     Regardless who compensates them, each racing official must be approved by the stewards before working in any capacity at a race meeting. 810 KAR 2:020 Section 1.

61.     Regardless who compensates them, every racing official on CDI grounds is under the stewards' supervision and control in the performance of their administrative duties. 810 KAR 2:020 Section 1(1) & (2).

62.     Regardless who compensates them, racing officials are forbidden from owning (directly or indirectly) a beneficial interest in a horse of the breed in which the person is engaged as a racing official or in an association under his or her supervision; causing to be bought or sold (for themselves or someone else) a horse under his or her supervision; buying or selling the right to, or a contract with, a jockey under his or her supervision; wagering on a race under his or her supervision; writing or soliciting horse insurance; or having any monetary interest in a business which seeks the patronage of horsemen or racing associations. 810 KAR 2:020 Section 1(3).

63.     Every racing official's and assistant racing official's duties are established by law (not by CDI) and include as follows:

        a.     The racing secretary is responsible for (among other responsibilities) programming races during race meetings, receiving entries, compiling and publishing the condition book, maintaining a record of monies received incident to the race meeting, assigning stabling, and publishing the official daily program. 810 KAR 2:020 Section 2. The racing secretary assigns stall applicants stabling only after consultation with the stewards. 810 KAR 2:020 Section 2(9). The stewards may "advise the association of undesirable persons" applying for stall applications. 810 KAR 2:040 Section 5(7). The stewards retain, however, the ultimate say in whether a particular applicant should be denied stall space. 810 KAR 2:040 Section 4(5). The stewards likewise supervise entries taken by the racing secretary and may refuse the entry of a horse by any person. 810 KAR 2:040 Section 5(8). The denial of an entry will be recorded in a daily "Stewards Report,"

which must be signed by all three stewards. 810 KAR 2:040 Section 5(11), (13). As with the decision to assign stall space, the stewards retain the ultimate authority over whether a particular horse should be denied entry. 810 KAR 2:040 Section 4(5).

b.     The clerk of scales is responsible for (among other responsibilities) security, regulation, and control of the jockey's room; weighing in and weighing out jockeys; safekeeping racing colors; supervising valets; and supervising the issuance of numbered saddle cloths and equipment for each horse. 810 KAR 2:020 Section 3.

c.     The paddock judge is responsible for (among other responsibilities) general supervision of the paddock, assembling the horses and jockeys in the paddock, maintaining a written record of all equipment for each horse saddled, inspecting all equipment, reporting any changes in the equipment to the stewards, inspecting (and ordering the replacement of) bandages, and paddock schooling. 810 KAR 2:020 Section 4.

d.     The starter is responsible for (among other responsibilities) ensuring the fair and equal starts of horses by means of a starting gate and bell, activating the starting gate or bell by his or her signal, and causing the loading of horses.

64.     Collectively, these and other racing officials are responsible for virtually all aspects of conducting, managing, and operating a race meeting at CDI racetracks in Kentucky. Assistant racing "officials" are responsible for assigning stabling, receiving entries, inspecting horses and jockeys, renting equipment, distributing purses, and conducting post-race testing. At all times, these racing officials conduct these administrative duties answerable to and under the direction and supervision of the stewards. *See generally* 810 KAR 4:040; 810 KAR 2:010; 810 KAR 2:020.

65.     Kentucky law cloaks CDI and all racing "officials" in a governmental immunity with respect to the performance of their duties and the exercise of their discretion with respect

thereto. K.R.S. § 230.760.[4] By regulation, "all association [CDI] racing department employees" are racing "officials" within the scope of this immunity. *See* 810 KAR 2:001 Section 1(50) (defining "racing official"). As such, CDI and its employees, together with the Racing Commission and its employees, receive the benefit of governmental immunity as "officials" for their roles in hosting and facilitating a race meeting on CDI racetracks.

66.     Racing on CDI tracks is also regulated at the federal level. In 2020, Congress passed and the President signed the Horseracing Integrity and Safety Act ("the Act"), which adds an additional (and superior) level of oversight of horse racing associations nationally. *See* 15 U.S.C. §§ 3051 to 3060. Effective December 27, 2020, the Act creates the Horseracing Integrity and Safety Authority. The Authority, the Federal Trade Commission, and a to-be-determined anti-doping and medication control enforcement agency "exercise independent and *exclusive* national authority over — (A) the safety, welfare, and integrity of covered horses, covered persons, and covered horse races; and (B) all horseracing safety, performance, and anti-doping and medication control matters for covered horses, covered persons, and covered horseraces . . . ." 15 U.S.C. § 3054(a)(2) (emphasis added).[5]

67.     The Act's purpose is, in part, to address the problems that inhere in the inconsistent rules and standards regarding medication violations promulgated and enforced by independent

---

[4] The scope of this statutory immunity is broad:

> No licensee conducting a race or meet hereunder, no member of the racing commission, judge, or assistant official appointed to act as such pursuant to this chapter, shall be liable for damages to any person, association, or corporation for any cause whatsoever arising out of or from the performance by the licensee, member of the racing commission, judge, or assistant official of his duties and the exercise of his discretion with respect thereto, so long as he acted in good faith, without malice or improper motive.

K.R.S. § 230.760.

[5] A "covered" horse generally refers to any horse owned and trained to participate in horse races. Covered horseraces refer to all licensed races with a substantial relation to interstate commerce. And a covered person is defined broadly to reach virtually everyone directly involved with horseracing, including trainers and racetracks. *See* 15 U.S.C. § 3051(4)-(6).

bodies, and it accomplishes that purpose with an express mandate to create uniform rules that are uniformly administered across the country. *See* 15 U.S.C. § 3055(b)(3); 15 U.S.C. § 3056(b)(2).

68.     The Act preempts "any provision of State law or regulation with respect to matters with the jurisdiction of the Authority." 15 U.S.C. § 3054(b).

69.     The Act further provides that enforcement actions for alleged medication violations "shall provide for adequate due process, including impartial hearing officers or tribunals," *see* 15 U.S.C. § 3057(c)(3), and provides for both administrative and judicial appeals of a decision to impose a sanction for medication violations, *see* 15 U.S.C. § 3058.

70.     The Act's national scope will replace the piecemeal, state-by-state or actor-by-actor enforcement of medication protocols in horse racing, but it will permit the Authority to contract with state racing commissions (not racing associations like CDI) to implement anti-doping and medication controls in conjunction with the anti-doping and medication control enforcement agency. 15 U.S.C. § 3060(a)(1).

### The 147th Running of the Kentucky Derby and Post-Race Testing

71.     On May 1, 2021, MEDINA SPIRIT won the 147th running of the Kentucky Derby. Baffert is the trainer of the Thoroughbred racehorse MEDINA SPIRIT.

72.     Barbara Borden and Butch Becraft acted as the two Racing Commission stewards at the Kentucky Derby.

73.     The Racing Commission approved CDI's nominee, Tyler Picklesimer, as the third steward for the Kentucky Derby. Picklesimer is the racing director at Turfway Park, a CDI property. He is a CDI employee compensated by CDI.

74.     Racing Commission regulations require that, in races for purses of $100,000 or more, the horse finishing first and at least one other horse must be sampled and tested. *See* 810 KAR 8:060 Section 2(3).

75.     Following the Kentucky Derby, a Racing Commission veterinarian collected blood and urine samples from MEDINA SPIRIT at a Racing Commission facility maintained at the Churchill Downs racetrack.

76.     Racing Commission personnel then divided the blood and urine samples into a "primary sample" and a "split sample." The "primary sample" is the portion of each sample selected by the Racing Commission to be tested at the Racing Commission laboratory. 810 KAR 8.010 Section 1(6). The "split sample" is the portion of each biologic sample to be tested by the split sample laboratory. 810 KAR 8:010 Section 1(7). After a race, the primary sample is immediately tested. The split sample, however, remains in the Racing Commission's possession and is not tested unless the primary sample tests positive for a substance listed as a prohibited race-day substance on the Racing Commission's medication schedule. 810 KAR 8:010 Section 11(3).

77.     Under Kentucky's regulations, there is no formal calling of a positive result until both the primary and split samples confirm the same finding. Thereafter, the matter is set for a hearing before the stewards. Any adverse action related to a disqualification of a horse or to a suspension of a trainer (or other licensee) occurs only after the foregoing steps have been followed. 810 KAR 9:010.

78.     On May 8, 2021, a Racing Commission agent or employee leaked to the press information that MEDINA SPIRIT's primary sample had tested positive for betamethasone, a lawful and commonly used therapeutic medication. Before hearing any word from the Racing Commission, Baffert received calls from the press stating that MEDINA SPIRIT's primary sample

had tested positive for betamethasone, prompting him to respond publicly to the allegations. The Racing Commission subsequently notified Baffert that MEDINA SPIRIT's primary sample had tested positive for betamethasone at a blood-concentration of 21 picograms per mL. A picogram is one-*trillionth* of a gram.

79.     Betamethasone is labeled by the Kentucky Horse Racing Commission as a Class C substance. Class A and B substances are the most highly regulated and deemed to possess the most potential to alter the outcome of a race. Class C substances, however, are considered much more benign. Betamethasone is approved for use by the United States Food and Drug Administration and is recognized by the Racing Medication Testing Consortium and Association of Racing Commissioners International as a valuable and ethical therapeutic substance used in the routine care of thoroughbred racing horses. Two distinct substances containing betamethasone are relevant to this cause: betamethasone acetate and betamethasone valerate.

80.     Betamethasone acetate is an injectable medication set forth on the Controlled Therapeutic Medication Schedule, and its use is expressly permitted on therapeutic administration and withdrawal guidelines. Betamethasone acetate is a common medication given to horses through injection into a joint, and its purpose is to prevent a horse from overloading other joints when an articular joint is inflamed. If a horse is treated with this medication by injection, Kentucky's regulations require a fourteen-day stand-down period to permit whatever condition necessitated the injection to resolve prior to race day. 810 KAR 8:025 Section 1(3)(b)(3.)(k.)(i).

81.     Betamethasone's classification as a "Class C" substance, rather than a Class D or non-classified substance, and its associated penalty scheme under Kentucky law are based entirely on scientific data describing the pharmacodynamics and risks associated with betamethasone acetate injections.

82.     Betamethasone valerate (a substance distinct from betamethasone acetate) is a common agent in antibiotic and antifungal ointments applied topically to the skin without an injection, and it is used to treat a variety of rashes and other skin conditions. Betamethasone valerate reduces inflammation to the infected area, which enhances the efficacy and effectiveness of the active ingredients, gentamicin (an antibiotic) and clotrimazole (an antifungal medication).

83.     There are, however, other methods in which betamethasone may unintentionally enter a horse's system. Scientific studies have proven that environmental and/or innocent contamination can lead to substances such as betamethasone being detected in a horse's blood up to levels of 100 picograms. This risk of environmental or inadvertent contamination has become magnified as technology improves and tests employed by various racing jurisdictions become more and more sensitive and capable of detecting increasingly more minute and clinically irrelevant levels of substances.

*CDI's Suspensions*

84.     On May 9, 2021, without any notice to Baffert and prior to any confirmatory testing, CDI issued a statement announcing that MEDINA SPIRIT's post-race sample "indicated a violation of the Commonwealth of Kentucky's equine medication protocols." CDI stated that it does not tolerate violations of medication protocols, cited the "seriousness of the alleged offense," and announced that Baffert would be immediately suspended from entering any horses at Churchill Downs Racetrack for an indefinite period of time.

85.     The full text of the May 9, 2021, statement is as follows:

> It is our understanding that Kentucky Derby winner Medina Spirit's post-race blood sample indicated a violation of the Commonwealth of Kentucky's equine medication protocols. The connections of Medina Spirit have the right to request a test of a split sample and we understand they intend to do so. To be clear, if the findings are

upheld, Medina Spirit's results in the Kentucky Derby will be invalidated and Mandaloun will be declared the winner.

Failure to comply with the rules and medication protocols jeopardizes the safety of the horses and jockeys, the integrity of our sport and the reputation of the Kentucky Derby and all who participate. Churchill Downs will not tolerate it. Given the seriousness of the alleged offense, Churchill Downs will immediately suspend Bob Baffert, the trainer of Medina Spirit, from entering any horses at Churchill Downs Racetrack. We will await the conclusion of the Kentucky Horse Racing Commissions' investigation before taking further steps.

86. On June 2, 2021, without any notice to Baffert and while testing was still ongoing, CDI expanded and clarified its suspension in a second press release. CDI announced that Baffert and any trainer directly or indirectly employed by Bob Baffert Racing Stables, Inc., was suspended from entering horses in races or applying for stall occupancy at all CDI-owned racetracks for two years. CDI reserved the right to extend the period of its suspension. Again, CDI relied upon the assertion that Kentucky's medication protocols had been violated, as well as the alleged positive test for betamethasone, prior to any formal process or finding by the Racing Commission. CDI's June 2 Press Release included statements by Carstanjen accusing Baffert of engaging in reckless practices; endangering the health, safety, and welfare of his horses; and citing what he called Baffert's "record of testing failures." Notably, the terms of CDI's purported "suspension" do not banish Baffert from the grounds or limit his right of access as a member of the general public to observe races on CDI properties. CDI's "suspension" is limited to making Baffert's horses ineligible for race entries and stabling privileges, which are functions assigned by law to the racing secretary and requires consultation with the stewards before a denial can occur.

87. The full text of the June 2, 2021, release is as follows:

Churchill Downs Incorporated ("CDI") announced today the suspension of Bob Baffert for two years effective immediately through the conclusion of the 2023 Spring Meet at Churchill Downs Racetrack. The suspension prohibits Baffert, or any trainer directly

23

or indirectly employed by Bob Baffert Racing Stables, from entering horses in races or applying for stall occupancy at all CDI-owned racetracks. This decision follows the confirmation by attorneys representing Bob Baffert of the presence of betamethasone, a prohibited race-day substance, in Medina Spirit's bloodstream on the day of the 147th running of the Kentucky Derby in violation of the Commonwealth of Kentucky's equine medication protocols and CDI's terms and conditions for racing.

"CDI has consistently advocated for strict medication regulations so that we can confidently ensure that horses are fit to race and the races are conducted fairly," said Bill Carstanjen, CEO of CDI. "Reckless practices and substance violations that jeopardize the safety of our equine and human athletes or compromise the integrity of our sport are not acceptable and as a company we must take measures to demonstrate that they will not be tolerated. Mr. Baffert's record of testing failures threatens public confidence in thoroughbred racing and the reputation of the Kentucky Derby. Given these repeated failures over the last year, including the increasingly extraordinary explanations, we firmly believe that asserting our rights to impose these measures is our duty and responsibility."

CDI reserves the right to extend Baffert's suspension if there are additional violations in any racing jurisdiction.

The Kentucky Horse Racing Commission ("KHRC") has the sole authority to disqualify Medina Spirt as the winner of Kentucky Derby 147. It is the understanding of CDI that the KHRC is pursuing the completion of its investigation of this matter in accordance with its rules and regulations.

88.     CDI does not have the legal authority to place conditions upon a license held by Baffert or any trainer who is employed under Bob Baffert Racing Stable; that authority rests solely with the Racing Commission as the entity that issued his occupational license — a license that affords Baffert a constitutionally protected property interest under state law.

89.     Nevertheless, by purporting to summarily and indefinitely suspend Baffert from these CDI tracks, it has barred Baffert from over half the available racing days in the Commonwealth of Kentucky, causing immediate and substantial reputational and economic harm. Most importantly, CDI has barred Baffert and any horse directly or indirectly trained by him from

the Kentucky Derby — horseracing's signature event — which is essential to Baffert's viability as a trainer.

90.     Baffert, both directly and through counsel, asked Mr. Carstanjen for an opportunity to rebut the allegations levied by him and CDI.

91.     CDI, through counsel, denied Baffert's request based on what counsel alleged to be an unqualified right to exclude trainers from participating in horse racing at CDI racetracks.

92.     As a result of CDI's actions, Baffert and his employees are the only trainers suspended from racing on CDI properties. CDI, its directors, and its officers have specifically targeted Baffert despite the prevalence of more severe medication violations — real violations — by other owners and trainers who race on CDI properties, including trainers and owners closely associated with CDI officers and directors. Some of these trainers have been recently suspended for medication violations on CDI tracks, yet CDI continues to take action only against Baffert.

93.     On September 10, 2021, CDI subsequently instituted a new "rule" prohibiting any horse trained by a person suspended from running at Churchill Downs from earning points to qualify for the Kentucky Derby or the Kentucky Oaks, even if those qualifying races are not held on CDI properties. The full text of CDI's new "rule" is as follows:

> Effective Sept. 30, 2021, points from any race in the Road to the Kentucky Derby or Kentucky Oaks will not be awarded to any horse trained by any individual who is suspended from racing in the 2022 Kentucky Derby or 2022 Kentucky Oaks or any trainer directly or indirectly employed, supervised, or advised by a suspended trainer. Should a horse trained by a suspended trainer, or any trainer directly or indirectly employed, supervised, or advised by a suspended trainer, finish in a position that would have earned points in a Road to the Kentucky Derby or Kentucky Oaks race occurring after Sept. 30, 2021, the points associated with that finish position will be vacated.

Baffert is the only trainer affected by this rule; in short, Baffert has been singled out for arbitrary, capricious, and disparate treatment.

94.     CDI announced its rule prohibiting Baffert and any horse trained directly or indirectly by him from gaining points for the Kentucky Derby three days before Keeneland's September Yearling Sale, the world's most important Thoroughbred yearling sale, which Baffert and his associated owners regularly attend.

95.     CDI has, with malicious intent, caused significant damage to Baffert's ability to conduct his customary business on a national scale. From context, it is apparent that CDI's targeted sanctions have the singular aim of destroying Baffert's career.

96.     On November 5, 2021, the Baffert-trained horse CORNICHE won the Breeders' Cup Juvenile (a Grade 1 stakes race) at Del Mar Racetrack in California. The Breeders' Cup is a Kentucky Derby points-eligible competition. Baffert horses continue to dominate points-eligible races, yet CDI refuses to recognize the points CORNICHE earned. Several other Baffert horses have had comparable success and have won races that entitle them to points but for CDI's edicts.

97.     CDI's "suspension" has rendered valueless Baffert's training services at a national level. He is ineligible to compete in one-third of the Triple Crown, an achievement he has won twice. And because CDI has banned him for two years, the duration of that "suspension" far exceeds any penalty the Racing Commission could lawfully impose. His participation and success in the upper echelon of Thoroughbred racing is Baffert's trade. CDI's suspension is, in practical effect, a banishment from meaningful participation in top tiers of horse racing nationally, depriving him of the opportunity to earn substantial fees and winnings from training the world's most elite horses.

*Subsequent Testing and Current Proceedings*

98.     In the weeks leading up to the Kentucky Derby, MEDINA SPIRIT was treated in California (his home base) for a skin condition by a veterinarian with a topical ointment called

OTOMAX. California requires that medication treatments given to a horse must be contemporaneously reported on a daily basis to the Jockey Club, an industry-leading equine-welfare organization, which records that treatment in a national database. In full compliance with these requirements, MEDINA SPIRIT's veterinarian contemporaneously reported the treatment with OTOMAX to that national database, which was accessible to any regulatory authority that sought it, including the Racing Commission. After the positive test result, the veterinarian informed Baffert that one of the ingredients in OTOMAX is betamethasone valerate and that the ointment could explain the test result.

99.    Betamethasone is not regulated or prohibited in its topical form, betamethasone valerate. Only its injectable form, betamethasone acetate, is regulated by the Racing Commission according to "Restricted Administration Time" rule (prohibiting an intra-articular injection within fourteen days of a race) and a "Stacking" rule (prohibiting the presence of more than one corticosteroid in a post-race sample).

100.    OTOMAX and identical products under different trade names are common antibiotic/antifungal medications used in everyday veterinary care for a variety of skin conditions in horses. Betamethasone/gentamicin ointments identical in formulation to OTOMAX are regularly prescribed and used to treat skin conditions in household pets like cats and dogs and are in the same class of medications prescribed to humans for minor rashes and skin irritations associated with insect bites or contact with plants like poison oak, ivy, and sumac. Betamethasone valerate absorbed through the skin is biologically irrelevant to a horse at the levels reported by the Racing Commission laboratory, poses no danger to the horse's safety and welfare, has no potential to influence the outcome of a race, is not a performance-enhancing drug, cannot mask pain, and

has no effect on joints, *especially* at the minute, trillionth-of-a-gram levels reported by the testing laboratories.

101.    Baffert requested additional testing on MEDINA SPIRIT's biological samples to prove that the betamethasone detected in the samples was not the result of a prohibited injection into a joint prior to a race. This request was initially denied and staunchly resisted by the Racing Commission, prompting Baffert to get a court order requiring the Racing Commission to permit additional testing. On December 3, 2021, that subsequent testing revealed that the presence of betamethasone in MEDINA SPIRIT was not from an injection but from the topical ointment OTOMAX. The testing laboratory confirmed the presence of valerate and the absence of acetate, definitively proving that an injection with betamethasone acetate was not used.

102.    The adjudicative process in Kentucky is comprehensive. When the stewards suspect a violation, they provide the horse's trainer and owner with notice of the suspected violation and inform them of their right to an evidentiary hearing before the stewards. 810 KAR 9:010 Section 1(3). After that hearing, Baffert is entitled not only to an administrative adjudicatory appeal before the Kentucky Horse Racing Commission but also to subsequent appeals to courts of law prior to any final determination concerning his Kentucky license or MEDINA SPIRIT's status as the winner of the Kentucky Derby. 810 KAR 9:010 Section 1(9) & Section 4.

103.    At the hearing, all three stewards must review the evidence, must make a finding that a violation has or has not occurred and, if necessary, must recommend a penalty within the bounds of applicable regulations. 810 KAR 9:010 Section 1(2) & (7). Picklesimer, a steward compensated directly by CDI and independently employed by CDI as the racing director at Turfway Park, sat as the third steward (selected by CDI) at the stewards hearing regarding the alleged betamethasone positive for MEDINA SPIRIT.

28

104.    Under Kentucky law, the discretion to impose a penalty is constrained. The Racing Commission must consider mitigating factors — including the possibilities of contamination and inadvertence. The Racing Commission is required to consider mitigating factors because the extremely high standard imposed upon trainers essentially imposes strict liability for the presence of a medication without regard to fault. The Racing Commission was not required to prove (or even allege) that Baffert was attempting to cheat. The purpose of this rule, sometimes called the "trainer responsibility" or "absolute insurer" rule, is to ease the administrative burden of enforcing medication violations, given the difficulty of proving (1) the source of the medication and (2) the circumstances surrounding its administration. Public policy has deemed it necessary to thrust the burden of produce evidence regarding those questions upon the trainer.

105.    Furthermore, the Racing Commission can impose a penalty only within the strict limits of its regulations. Under Kentucky's penalty scheme for a Betamethasone Acetate violation (which this is not), the maximum penalty Baffert could receive based on his record is a thirty-day suspension. 810 KAR 8:030 Section 4(3)(b). The maximum he could have received on any record is a sixty-day suspension. *Id.*

106.    The stewards hearing regarding MEDINA SPIRIT's alleged betamethasone positive occurred on February 14, 2022. The stewards recommended a ninety-day suspension and disqualified MEDINA SPIRIT. Notably, the recommended ninety-day suspension is well outside even the maximum permissible range of penalties for serial violations of Kentucky's restricted-administration-time rule (permitting a maximum sixty-day suspension for three or more violations), which did not occur here. 810 KAR 8:030 Section 4(3)(b). As a matter of course, penalties are stayed during the pendency of an appeal. The Racing Commission has, in an unprecedent move, denied that stay, forcing Baffert to seek further relief in state court against the

29

Racing Commission's arbitrary and capricious actions against him. As of the date of this filing, that action is pending. Because an appeal is being sought and a full evidentiary hearing has not been held, the Racing Commission has not made any final determination that Baffert has committed any rules violation, that MEDINA SPIRIT has been disqualified, or that Baffert's license has been suspended.

<u>**COUNT 1**</u>
**(Violation of <u>42 U.S.C. § 1983</u>)**
**(CDI; Carstanjen, in his individual capacity; Rankin, in his individual capacity)**

107.    Baffert repeats and realleges the allegations in paragraphs 1 through 106 of this Complaint as though fully set forth herein.

108.    Baffert possesses a license issued by the Racing Commission to train and race horses in Kentucky.

109.    The United States Supreme Court has held that an occupational racing licensee, such as Baffert, possesses a property interest in his or her license under state law sufficient to invoke the due process protections under the Fourteenth Amendment, and that any deprivation of that interest is permissible only after a prompt post-suspension hearing. *Barry v. Barchi*, <u>443 U.S. 55</u> (1979); *see* 810 KAR 3:020 Section 3(6) ("If all requirements for licensure are met, a license shall be issued to the license applicant."); *see also id.* at Section 14(4) (permitting appeal of denial of license application); *id.* at Section 15(1) (setting forth grounds for suspension, revocation, or denial of license); *id.* at Section 15(3) (permitting appeal of license suspension or revocation); *id.* at Section 22(3)-(4) (same).

110.    CDI suspended Baffert from racing on CDI racetracks, depriving him of his full use and enjoyment of the property interest he carries in his license to race horses in Kentucky and elsewhere.

111.    CDI's two-year (although, in practice, indefinite) suspension without due process deprived Baffert of his protected liberty interests, including, but not limited to, his reputation as a well-respected thoroughbred horse trainer, which he cultivated over the course of his life.

112.    CDI's suspended Baffert without notice or a prompt post-suspension hearing, in violation of Baffert's rights to procedural due process under the Fourteenth Amendment to the United States Constitution.

113.    CDI's conduct is retaliatory and premised on Baffert's engagement in constitutionally protected activity, including expression of free speech and the presentation of legal defenses, in violation of Baffert's rights to substantive due process under the Fourteenth Amendment to the United States Constitution.

114.    CDI's suspension is twenty-four-times more severe than the maximum penalty contemplated under Kentucky regulations for any type of betamethasone violation, and eight times more severe than the stewards' recommended (and unlawful) penalty. Despite the prevalence of *actual* reckless and dangerous conduct by others trainers and owners (which have sometimes culminated in Racing Commission suspensions), CDI has arbitrarily and capriciously singled out Baffert for this baseless sanction in violation of Baffert's procedural and substantive due process rights under the Fourteenth Amendment to the United States Constitution.

115.    Defendants' suspension, by and through its agent Bill Carstanjen and its board of directors, was an action taken under color of State law.

116.    Horse racing, including the receiving of entries and assigning stabling space, is an exclusive public function in Kentucky managed, facilitated, and controlled by the State. Purely private horse racing has been outlawed in Kentucky for over a century. Under the framework that exists today, racing associations forfeit numerous property interests and rights as a condition of

obtaining a license to conduct race meetings and submit to the Racing Commission's "forceful" supervision *and control*. The nominally private character of CDI's business operations today is so overborne by the pervasive entwinement of public institutions and public officials in its composition and workings that CDI's action related to horse racing cannot be considered "purely private."

117.    The actual conduct of the race is managed, supervised, and controlled by the Racing Commission and its deputized "officials." The Racing Commission does more than just say at arms' length *how* racing should be conducted; the Racing Commission, *vis-à-vis* the stewards, is the entity that actually supervises, controls, and conducts the races on CDI properties in Kentucky. In fact, nearly every aspect of conducting the horse race meeting is conducted by persons cloaked with the power of the state as "racing officials," all of whom are ultimately under the supervision and control of the stewards, not CDI. Any person acting as a "racing official" (i.e., facilitating the conduct of the race) is entitled to an official immunity — even if that person is employed and compensated by CDI — subject to narrow exceptions. In sum:

      a.    State actors are responsible for programming racing days.

      b.    State actors receive the entries and make eligibility determinations.

      c.    State actors receive stall applications and assign stabling.

      d.    State actors supervise, manage, and control the conduct of racing at Churchill Downs and other CDI tracks in Kentucky.

      e.    State actors carry out virtually every ministerial duty related to conducting a horse race meeting.

118.    With regard to race meetings, the Racing Commission and CDI divide responsibilities to their mutual benefit. CDI's financing and provision of personnel provides

substantial cost savings to the Racing Commission. In return, Kentucky law (subject to exception) immunizes CDI and treats it as an arm of the Racing Commission with regard to its racing activities. The degree of entanglement and the mutual benefits conferred in this symbiotic relationship make CDI's punitive "suspension" fairly attributable to the state for purposes of 42 U.S.C. § 1983.

119.     CDI's reference to its "duty" to suspend Baffert conceals its true involvement in state activities. CDI nominates a steward, who is subsequently cloaked with the power and protection of the state despite his employment with CDI. Here, that steward was Picklesimer, a CDI employee and agent. Picklesimer reviewed the evidence regarding the alleged betamethasone positive and made the recommended finding of a violation in conjunction with two stewards compensated by the Racing Commission. Through this nomination process, CDI participates and participated (through its agent and employee) in the investigation and enforcement of rules violations as a state actor bound by the strictures of due process. Taking similar action in a nominally private manner does not negate its substantive entanglement with the state.

120.     CDI has no independent rules prohibiting betamethasone in horses, nor did it conduct its own investigation; it relied entirely upon the Racing Commission for both. The Racing Commission is responsible for CDI's "suspension." CDI and the Racing Commission cooperate in policing medication violations. CDI's suspension was initiated by state action, is a sanction similar to (albeit more severe than) ones contemplated by Kentucky regulations, and invokes the authority of the state. Although the Racing Commission has the power to forbid CDI's suspension, it has chosen not to do so. By initiating the suspension by leaking premature information to the press and through its subsequent inaction, the Racing Commission has put its weight behind CDI's activities.

121.    CDI is powerless to enforce its "suspension" on its own. CDI's declaration that Baffert must be denied race entries and stall space is enforceable only with the Racing Commission's blessing and the active assistance of state actors.

a.    Entries are received by the racing director, who is under the stewards' direct supervision. The stewards work in conjunction with CDI to assess eligibility and approve or deny entries. The racing director is performing an administrative function established and dictated by law, is entitled to official immunity in the performance of those duties, and is a state actor for the purpose of receiving entries and assigning stall space.

b.    Because the stewards, who are state actors, have the ultimate authority to determine whether a particular horse is or is not denied a race entry, CDI cannot enforce its determination that Baffert is ineligible for the Kentucky Derby — notwithstanding any qualifying points he otherwise earns — without the blessing of the stewards and the racing officials under the steward's supervision and control; i.e., without state action.

c.    Similarly, stabling decisions are made only after consultation with the stewards, who are state actors. The stewards have the ultimate authority to determine whether a particular stable applicant is assigned a stall space. As such, CDI cannot enforce its banishment from CDI stables without the State's blessing.

122.    CDI's unlawful suspension has caused Baffert to lose valuable opportunities to earn purse monies.

123.    CDI's unlawful suspension has unnecessarily tarnished Baffert's reputation as an elite thoroughbred horse trainer and subjected him to unwarranted public ridicule and condemnation. Contrary to the implication underscoring CDI's statements and conduct, the well-pleaded truth is that the Racing Commission has not even alleged that Baffert "cheated" or

endangered any horse. The Racing Commission imposes penalties under the Rules of Racing impose liability even in the absence of proof of wrongdoing — and often despite affirmative proof to the contrary.

124.    CDI's unlawful and unjustified conduct was knowing, intentional, and actuated with an improper motive.

125.    As a result of CDI's conduct, Baffert has been damaged, has suffered, and will continue to suffer irreparable harm for which there is no remedy at law.

126.    CDI's conduct was reckless, callously indifferent to Baffert's federally protected rights, and motivated by the specific, malicious intent to harm Baffert, entitling Baffert to punitive damages in excess of this Court's jurisdictional minimum.

<u>**COUNT 2**</u>
**(Unlawful Exclusion – Common Law)**
**(CDI)**

127.    Baffert repeats and realleges the allegations set forth in paragraphs 1 through 126 as though fully set forth herein.

*The Common Law Right to Exclude*

128.    At common law, a private racetrack owner possesses a common law right to exclude certain individuals (patrons and persons causing an immediate danger or distruption) from a racetrack. *See generally James v. Churchill Downs, Inc.*, <u>620 S.W.2d 323</u> (Ky. Ct. App. 1981). But that right is neither absolute nor unqualified. A racetrack owner may not, with impunity or without proper justification, arbitrarily banish a licensed trainer from participating at races on their tracks or from accessing stall space. *See Jacobson v. New York Racing Ass'n, Inc.*, <u>305 N.E.2d 765</u> (N.Y. 1973); *Cox v. National Jockey Club*, <u>323 N.E.2d 104</u> (Ill. Ct. App. 1974); *Marzocca v. Ferone*, <u>461 A.2d 1133</u> (N.J. 1983); *Carrillo v. My Way Holdings, LLC*, <u>389 P.3d 1087</u> (N.M.

2016). In contrast to a racetrack proprietor's common law right to exclude undesirable *patrons*, it is not necessary to the protection of its legitimate interests that CDI have an absolute immunity from having to justify the exclusion of a trainer whom the State (*vis-à-vis* the Racing Commission) has deemed fit to license.

129.   By virtue of the Racing Commission's licensing power, as well as its assignment of exclusive racing days, racing associations have a quasi-monopoly over racing. The Racing Commission severely restricts the number of racetracks in operation at any one time; in fact, the number of racetracks hosting a race meeting in Kentucky at any given time is *one*. And over half of the exclusive racing days in the 2021 calendar year were assigned to CDI tracks. Accordingly, even a valid exclusion (which this one is not) must be based on a reasonable, discretionary business judgment. The exclusion cannot be arbitrary or actuated by motives other than those relating to the best interests of racing generally.

130.   To whatever extent a common law right existed in Kentucky that allowed CDI unilaterally, prospectively, and punitively to exclude trainers from entering horses to enforce medication protocols, the Horse Racing Integrity and Safety Act abrogated it.[6]

131.   In Kentucky, to whatever extent a common law right to suspend trainers exists, the exercise of that right cannot be based on a unilateral enforcement of an alleged medication violation under State law. Kentucky regulations require that "[a]n alleged violation of the provisions of K.R.S. Chapter 230 [horseracing statutes] or KAR Title 810 [horseracing regulations] *shall be adjudicated in accordance with* [810 KAR 8:030], 810 KAR 9:010, and KRS

---

[6] The Act provides that it shall not be construed to modify, impair, or restrict the operation of State laws (e.g., State common law) "relating to criminal conduct, cruelty to animals, *matters **unrelated** to antidoping, medication control and racetrack and racing safety of covered horses and covered races*, and the use of medication in human participants in covered races." 15 U.S.C. § 3054(k)(3) (emphasis added). Given the Act's express purpose to promote uniformity in antidoping protocols and sanctions, permitting nominally private actors to create and enforce their own medication protocols would eviscerate the Act's implementation and viability.

Chapters 230 and 13B." 810 KAR 8:030. 810 KAR 8:030 provides an exhaustive penalty schedule

that sets forth specific minimum and maximum sanctions for specific violations. 810 KAR 9:010

requires that the stewards make a final determination about the existence of a medication violation

and the scope of any penalty. And K.R.S. Chapter 13B provides for a right of administrative and

judicial appeals. CDI's claimed unlimited right to exclude trainers, in practical effect, infringes on

the Racing Commission's exclusive power to license trainers and usurps the Racing Commission's

forceful control over horse racing.

132.    Further, CDI's common law rights are not uniform across its properties. In

Louisiana, where CDI has also banished Baffert from entering horses or applying for stall space,

CDI has no common law right to unilaterally exclude trainers *for any reason*. *Wolf v. Louisiana

State Racing Comm'n*, 545 So. 2d 976, 980 (La. 1989). Its actions must *first* be submitted to the

state's racing commission under the state's procedures, "which require notice and a hearing." *Id.*

CDI took none of those steps.

*Claim for Relief*

133.    CDI has no common law right to exclude Baffert from Kentucky racetracks or any

racetrack. The right to exclude Baffert from entering horses in races is held solely by the Racing

Commission as the entity legally responsible for issuing a state license, receiving entries, assigning

stall space, and enforcing medication violations.

134.    CDI has no common law right to exclude Baffert from Louisiana racetracks for any

reason at all. CDI failed to take the necessary procedural steps to exclude Baffert from its Louisiana

properties under Louisiana law.

135.    CDI's purported "suspension" was not genuinely an exercise of some common law

right of exclusion from entry onto the grounds. CDI does not own the Churchill Downs racetrack.

Furthermore, CDI has not prohibited Baffert from entering CDI grounds as a member of the general public.

136.    To the extent that CDI possesses a common law right to exclude trainers, the terms of CDI's suspension exceed that common law right:

a.    CDI's actions are purportedly premised on a violation of the Rules of Racing regarding medication protocols. The common law right to exclude cannot be based on alleged medication violations, which are subject to extensive, exclusive, and preemptive regulatory frameworks established by state and federal law.

b.    CDI's actions are purely punitive in nature and implicate Baffert's ability to engage in business on properties other than those owned or operated by CDI. Tenants and property owners do not have a common law right to inflict harm maliciously and intentionally onto others.

c.    Whatever property rights CDI may have as a tenant, those rights do not include the exclusion of Baffert from his participation in a public function or in a public market at a public recreation park.

137.    Because racetracks, racing associations, racing commissions, and racing boards nationally very frequently have the authority to reciprocate denials of entries and stall spaces when a trainer is denied entry or stall spaces on another track, CDI's unilateral edict has potentially broader implications than just an exclusion from its own properties; its exclusion extends to properties *it does not own or operate*.

138.    CDI has no valid business justification for its unlawful exclusion. Any purported justification is unreasonable given that CDI has jeopardized the graded status of all of its races,

including the Kentucky Derby and Kentucky Oaks, by restricting eligibility for entries on grounds other than the horse's age or sex.

139.    CDI's purported justifications for excluding Baffert because of so-called "reckless practices" and "record of testing failures" are pretextual:

a.    CDI permits trainers who have markedly higher rates of medication positives, have positives involving far more dangerous medications, have higher rates of horse fatalities to race on their grounds, and have been suspended by the Racing Commission.

b.    CDI has suspended *no one besides Baffert* for any medication violation.

c.    CDI's purported intolerance for medication violations belies its historical and present practice of looking the other way when more severe medication violations occur on their grounds, including by trainers retained by CDI directors, officers, and their family members.

d.    CDI acknowledged that the investigation into the MEDINA SPIRIT betamethasone positive was ongoing.

e.    Despite exonerating, scientific testing that proves that Baffert did not engage in any dangerous practice of injecting betamethasone into MEDINA SPIRIT's joints before the Kentucky Derby, CDI has continued its suspension and has never walked back its baseless narrative that Baffert acted recklessly with regard to his horses.

f.    In fact, in response to good faith efforts to avoid the mutual burdens of litigation, Defendants leaked a draft of this complaint — which was disclosed confidentially for purposes of settlement discussions — to the press and invited litigation. In doing so, Defendants again made public statements about Baffert it knows are wrong.

140.    By virtue of its position and influence, CDI actively caused and contributed to the negative publicity surrounding Baffert and the alleged betamethasone positive. As a self-proclaimed "industry leader" with national influence, CDI cannot assassinate Baffert's character as a trainer and then purport to suspend him because of his poor reputation:

a.    Media outlets consistently cite to CDI's suspension and Mr. Carstanjen's allegations when levying critiques against Baffert and the racing industry.

b.    Defendants' vague, deceptive, and imprecise language is consistently referenced by others to further a false narrative that Baffert is doping his horses with anabolic steroids, using performance enhancing drugs, and injecting his horses with betamethasone.

c.    And racing associations nationally have piggybacked on CDI's "suspension" to impose their own sanctions against Baffert, citing directly to Defendants' various press releases.

141.    As is apparent from the totality of its conduct, CDI's actions were not taken in the best interest of horse racing generally. Instead, they were taken with the singular, targeted, and malicious intent to destroy Baffert's career.

142.    CDI's unlawful suspension despite Baffert's valid license will cause Baffert to lose valuable opportunities to earn purse monies on CDI properties and elsewhere, and will unnecessarily tarnish his reputation as an elite Thoroughbred horse trainer.

143.    Because Baffert is also precluded from gaining points for the Kentucky Derby by virtue of his exclusion, the consequence of CDI's exclusion is that Baffert is barred from participating at a high-level of thoroughbred racing nationally. Exclusion from CDI tracks is therefore tantamount to barring Baffert from pursuing his chosen profession.

144.     As a result of CDI's conduct, Baffert has been damaged, has suffered, and will continue to suffer irreparable harm, the value of which exceeds $75,000, and for which there is no remedy at law.

**ADDITIONAL FACTS FOR COUNTS 3 AND 4**
**(Antitrust Violations – 15 U.S.C. §§ 1, 2, 15, 26)**
**(All Defendants)**

145.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 144 as though fully set forth herein.

*Relevant Markets and Market Participants*

146.     Baffert competes with other trainers for the business of training horses that are owned by others. Baffert has historically competed at the Kentucky Derby and Kentucky Oaks as a trainer, regularly enters horses at races on CDI tracks in stakes and claiming races, and regularly competes against trainers nationally for purses, prizes, and qualifying points for prestigious competitions like the Kentucky Derby and Kentucky Oaks. Baffert has trained three of the previous five Kentucky Derby winners. Because of his success at prestigious races on CDI tracks — including the Kentucky Derby — Baffert's training services have been vigorously sought after by owners of elite horses around the world.

147.     Horses are typically entered into races by the horse's owner and trainer, who enter into a business relationship for the sole purpose of racing horses. Baffert and his affiliated owners compete together as a unit against other trainers and their affiliated owners for purses, prizes, and qualifying points, which collectively determine the market value of the owners' horses for later breeding or sale. Owners retain the vast majority of the prize money, with trainers retaining a smaller portion of the winnings.

148.     Rankin and other directors, officers, and/or agents at CDI enter horses in claiming and stakes races on CDI properties, including in races against trainers who regularly qualify for the Kentucky Derby.

149.     Rankin owns and breeds thoroughbred horses through Upson Downs, which is a thoroughbred breeding and racing operation unaffiliated with CDI. For over two decades, Upson Downs has entered horses in races at CDI tracks and elsewhere.

150.     Rankin breeds the horses trained and raced in the owner/trainer ventures he forms personally and through his businesses, including Upson Downs. Those horses' progeny compete directly against the progeny of horses trained and raced under Baffert's owner/trainer ventures in yearling sales throughout the country. The value of these horses' progeny is determined by the success of their sires in prestigious races — in particular, races on CDI tracks such as the Kentucky Derby and Kentucky Oaks.

151.     In their capacities as owners of racing horses, CDI's directors, officers and/or agents (including Rankin) do not share a unity of interest with CDI in its capacity as the host of race meetings. Rankin and CDI's other directors, officers, and/or agents are distinct economic entities to the extent they race horses on CDI tracks for their personal profit. CDI does not own or control the horses that Rankin and others race at CDI tracks, does not share in purses and prizes with Rankin and others for their racing activities on CDI tracks, and has no economic interest in their individual successes or failures. The profits and losses from those horses accrue entirely to the individual persons (including Rankin) who own and race them.

152.     CDI tracks exist in at least seven states. CDI solicits and attracts entries by owners and trainers nationally and internationally. Owners and trainers from around the globe compete for placement in the Kentucky Derby.

153.    As mentioned previously, CDI's unilateral denials of entries and stall space for Baffert-trained has potentially national implications for Baffert's business. Most racing jurisdictions authorize racing commissions, boards, or associations to deny entry to any person denied entry by a racing association in any jurisdiction. In that manner, CDI's actions affect interstate commerce beyond the boundaries of its properties.

154.    Racing at CDI tracks — and specifically at Churchill Downs — is a unique market considering its prestige as the pinnacle of horseracing: there is only one Kentucky Derby and only one Kentucky Oaks. Winning either of these races is a legendary, historic achievement that is unmatched in the sport of horseracing. Given that only one horse per year can win the Kentucky Derby or Kentucky Oaks respectively, and given that the qualification process consists of other prestigious races nationally (on CDI tracks and elsewhere), training Derby horses is an extremely competitive market. All Derby trainers are competing for a single prize: winning the Kentucky Derby or Kentucky Oaks. There is no substitute for winning the Kentucky Derby or the Kentucky Oaks, and there is no substitute for the market of training and racing Derby horses. [7] As such, there is no substitute for racing at Churchill Downs.

155.    Racing at Churchill Downs and other CDI tracks is an essential part of the horse racing, breeding, and ownership markets nationally. Before CDI's edicts targeting Baffert and Baffert-trained horses, the process of qualifying to the Kentucky Derby and Kentucky Oaks was designed to narrow the field to the best of the best horses in the world. On that merit, horses that win the Kentucky Derby or Kentucky Oaks immediately increase in value to the tens of millions of dollars, and the value of their foals likewise skyrocket. Naturally, the value of a trainer's services correspondingly increases after winning the Kentucky Derby or Kentucky Oaks.

---

[7] For purposes of this Complaint, "Derby horses" refers to any horse eligible to compete for the Kentucky Derby and, by extension, the Triple Crown. "Derby horses" also encompasses horses eligible to compete at the Kentucky Oaks.

156.    Owners whose horses have won the Kentucky Derby or Kentucky Oaks can subsequently enter the exclusive and lucrative market for breeding those horses.

*Plaintiffs' Standing and Damages*

157.    Given that Baffert-trained horses regularly qualify for and consistently win competitions at the highest level of the sport, banning Baffert-trained horses from CDI tracks ultimately reduces competition for qualifying positions and for the chance to compete for prestigious prizes — including the Kentucky Derby and Kentucky Oaks. Elite thoroughbred race horses are the product of unique owner/trainer ventures. By excluding some of the most elite horses from CDI tracks, Defendants have reduced the overall quality of horses and ventures eligible to compete for the prestigious, exclusive, and unique prizes that are the Kentucky Derby and the Kentucky Oaks, not to mention the Triple Crown. Contrary to the historical intent and design of the Road to the Kentucky Derby and Road to the Kentucky Oaks, qualifying horses will not reach the pinnacle of horseracing solely by virtue of the superior efficiencies of the unique trainer/owner ventures that produce racing horses. Rather, the eligible field will be determined, in part, by whom Defendants *choose to allow* to participate in the market for Derby horses. As a direct result of Defendants' anti-competitive behavior excluding Baffert-trained horses, whether the eventual winner of the upcoming runnings of the Kentucky Derby and Kentucky Oaks reflects the true value of the thoroughbred horse and its associated owner/trainer venture will remain forever unknown.

158.    Similarly, Defendants' exclusion was not taken for the benefit of CDI, the Kentucky Derby, or its brand, and it has no pro-business justification. Defendants' exclusionary conduct expressly prohibits horses from competing in the Kentucky Derby solely based on the identity of the person who trained them. This eligibility restriction makes the Kentucky Derby and Kentucky Oaks "restricted" races as that term is defined by the American Graded Stakes

Committee. Because a restricted race is ineligible for grading at any level, CDI's actions have jeopardized the integrity of its brand, subjected the Kentucky Derby to possible revocation of *any* graded status, and placed an asterisk on the winner of any Kentucky Derby in which Baffert-trained horses are prohibited from competing.

159.    As the party directly named in CDI's "suspension," Baffert is the most direct victim of Defendants' anti-competitive behavior, and he is uniquely situated to enforce an antitrust action against Defendants.

160.    Baffert's exclusion from competing in races at CDI tracks, including in the Kentucky Derby and Kentucky Oaks, was the direct and intended consequence of Defendants' anti-competitive behavior.

161.    The destruction of the unique business relationships between Baffert and his affiliated owners that do and could compete against the unique business relationships between Rankin and his trainers was the direct and intended consequence of Defendants' unlawful conspiracy to restrain trade and of their unlawful use of their monopoly power.

162.    CDI's prohibition against Baffert-trained *horses* gaining points for the Kentucky Derby precludes Baffert from training a horse during the qualifying period with the owner's understanding that a *different* trainer must enter the horse in the Kentucky Derby. The vast majority of these qualifying races occur not on CDI properties but on independent venues of national acclaim. The intent and effect of this provision was to discourage owners from contracting with Baffert to enter Derby-eligible horses in prominent racing venues nationally and throughout the racing season notwithstanding the fact that those venues are outside CDI's direct control.

163.    As a direct and proximate result of Defendants' anti-competitive behavior in excluding Baffert from competing at CDI tracks, several owners promptly transferred their horses

from Baffert to other trainers and will no longer send Derby horses to Baffert until CDI's "suspension" is resolved.

164.     As a direct and proximate result of Defendants' anti-competitive behavior in excluding Baffert from competing at CDI tracks, Baffert is unable to participate in the upper echelons of thoroughbred racing and training, his horses have reduced value on the market nationally, his training services have reduced value on the market nationally, and he is unable to compete for purses and prizes at CDI tracks.

### COUNT 3
**(Unlawful Conspiracy in Restraint of Trade – 15 U.S.C. §§ 1, 15, 26)**
**(All Defendants)**

165.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 164 as though fully set forth herein.

166.     CDI, Carstanjen, Rankin, and CDI's directors, officers, and/or agents entered into an unlawful contract, combination, or conspiracy to exclude Baffert from participating in horse race meetings on CDI properties and elsewhere.

167.     Defendants' conspiracy was intended to and did reach and affect trade occurring in interstate commerce.

168.     Rankin, other members of the Board, and officers/agents at CDI have used their positions to declare that Baffert-trained horses cannot compete against them. In this way, Rankin and others have elected to forego attempting to defeat Baffert on a racetrack in favor of defeating him from the comfort of a boardroom.

169.     Because Defendants occupy different levels of the horseracing market (i.e., racing association, thoroughbred breeders, and racing participants), their concerted action joined two or more independent sources of economic power that were previously pursuing separate interests and

restricted the decisions of consumers of training services, thereby depriving the horseracing market of independent centers of decision-making at multiple levels.

170.    Defendants, by virtue of their control over CDI, have expressly conditioned participation in the Kentucky Derby, Kentucky Oaks, and other races at Churchill Downs on the refusal to employ Baffert as a trainer, which unreasonably restrains trade by eliminating the business relationships that can compete against Rankin's horses for purses, prizes, and prestige at CDI tracks as well as by reducing the current and potential value of Baffert-trained stallions and mares in the breeding market.

171.    Defendants' unlawful combination, contract, or conspiracy is an exclusive dealing agreement that unreasonably restrains trade.

172.    Churchill Downs Racetrack is an essential facility for trainers in the market for Derby horses. It is the only racetrack that does — or could — host the Kentucky Derby or Kentucky Oaks. Rankin, by virtue of his position as Chairman of the Board at CDI, has denied his competitor Baffert any access to use Churchill Downs Racetrack while permitting himself and his trainers to use the same facilities without restraint. This denial of an essential facility is an unreasonable restraint on trade.

173.    Excluding Baffert from participating in race meetings is a vertical restraint on trade that unreasonably reduces competition against Rankin and other directors/officers/agents of CDI for prestige, purses, prizes, and placement in claiming and stakes races in at least seven states by expressly limiting the number of trainers who can compete against them.

174.    Defendants' restraint of competition, imposed by virtue of their substantial control over horse race meetings in at least seven states, by their exclusive market control over the Kentucky Derby and Kentucky Oaks, and by their extensive national influence, inures to the

personal financial benefit of Rankin and other directors, officers, and/or agents who enter horses at race meetings on CDI properties and elsewhere by eliminating the winningest trainer at the Kentucky Derby as a competitor for purses, prizes, and placement in claiming and stakes races.

175.    Defendants' concerted, anti-competitive behavior targets the horses trained "directly" or "indirectly" by Baffert with the intent to destroy Baffert's unique owner/trainer business relationships. Destroying these relationships has the potential to raise the value of horses owned by Rankin and other directors/officers/agents at CDI while simultaneously reducing or eliminating the value of Baffert-trained horses. To the extent Rankin receives these benefits, he will have done so not from any superior efficiency in his horseracing operations but from his substantial control over CDI racetracks and his influence over the industry as a whole.

176.    Defendants have no legitimate pro-business justification for their anti-competitive conduct, and any purported justifications are pretextual.

177.    As a result of Defendants' anti-competitive conduct, Baffert has been damaged, has suffered, and will continue to suffer irreparable harm for which there is no remedy at law and damages in an amount that exceeds the jurisdictional minimum of this Court.

### COUNT 4
**(Unlawful Use of Monopoly Power - 15 U.S.C. §§ 2, 15, 26)**
**(All Defendants)**

178.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 177 as though fully set forth herein.

179.    CDI is a self-proclaimed industry leader in horse racing and pari-mutuel wagering, with properties, market power, and influence that span several states.

180.    By virtue of the licensing powers of the respective racing commissions or boards in the states in which CDI operates, CDI possesses a quasi-monopoly over racing days in several

states, and the number of entities permitted to host race meetings is extremely limited. Under Kentucky law, the Racing Commission restricts the entities that can host race meetings, provide part-mutuel wagering on live Thoroughbred racing, and simulcast Thoroughbred racing in Kentucky.

181.    Approximately one out of every forty horse races in the United States is run on CDI racetracks. These races include stakes and claiming races. Because other jurisdictions have the power to reciprocate CDI's suspension, however, CDI has the power to restrain a trainer's participation in the entire national market for Thoroughbred horse racing if its suspensions are permitted to stand.

182.    CDI is the exclusive host of the Kentucky Derby and the Kentucky Oaks and holds a monopoly power over the Kentucky Derby and Kentucky Oaks. As the host of the Kentucky Derby, CDI hosts one-third of the Triple Crown races annually. By virtue of its control over the Kentucky Derby and Kentucky Oaks, Defendants' decision to exclude trainers from any eligibility to compete for or at the Kentucky Derby or Kentucky Oaks amounts to an absolute power to control entry into the market for training Derby horses.

183.    Churchill Downs Racetrack is an essential facility for trainers in the market for Derby horses. It is the only racetrack that does — or could — host the Kentucky Derby or Kentucky Oaks. Rankin, by virtue of his position as Chairman of the Board at CDI, has denied his competitor Baffert any access to use Churchill Downs Racetrack while permitting himself and his trainers to use the same facilities without restraint. Defendants, through their unilateral exclusion by virtue of their control over an essential facility, have destroyed competition in the marketplaces for racing and breeding Derby horses by unlawfully excluding perhaps the most substantial competitor in those markets.

184.    By excluding any horse "indirectly" trained by Baffert from gaining qualifying points, Defendants have eliminated elite horses from competing for the unique status of winning a Kentucky Derby or Kentucky Oaks title. Defendants' concerted action to exclude Baffert-trained horses, which has restricted owners' market entry into (i.e., reduced competition for) an elite breeding marketplace for Derby horses, inures to Rankin's direct benefit as a breeder of racing horses by eliminating perhaps the strongest competitor for that distinction.

185.    Baffert's exclusion from these markets was the result of Defendants' control over the marketplace for Derby horses and was not the result of any superior efficiency in the racing operations of Rankin or other CDI directors, officers, and/or agents who race horses or breed horses to race on CDI tracks and elsewhere.

186.    Defendants have no legitimate pro-business justification for their anti-competitive conduct, and any purported justifications are pretextual.

187.    As a result of Defendants' anti-competitive conduct, Baffert has been damaged, has suffered, and will continue to suffer irreparable harm for which there is no remedy at law and damages in an amount that exceeds the jurisdictional minimum of this Court.

## COUNT 5
### (Tortious Interference with Contractual Relations – Common Law)
### (CDI, Carstanjen)

188.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 187 as though fully set forth herein.

189.    In May 2021, Baffert and Bob Baffert Racing Stables, Inc., had contractual relationships with Thoroughbred race horse owners including, but not limited to, Spendthrift Farm, MyRacehorse Stable, Winstar Farm, Juddmonte Farms, and Gary West, that contend for the Kentucky Derby.

190.   In May 2021, CDI and its agents were aware that Baffert Bob Baffert Racing Stables, Inc. had contractual relationships with such owners.

191.   CDI and its agents intentionally and with malice suspended horses trained by Baffert or his employees from racing at CDI racetracks, which include the host track for the Kentucky Derby.

192.   Denying Baffert any participation in the flagship event for horse racing diminishes the value of Baffert-trained horses, which caused owners to cancel training agreements with Baffert or threaten to cancel training agreements for the duration of the suspension. Specifically, as a direct and proximate result of CDI's unlawful actions, the lucrative horses Life is Good, Following Sea, and Forbidden Kingdom were moved to other trainers. Life is Good, alone, has earned approximately $2.5 million in winnings since leaving Baffert.

193.   Baffert has a reasonable expectation of obtaining the advantages, economic or otherwise, he would have derived as a trainer racing on CDI racetracks.

194.   By unilaterally denying Baffert any right to participate in CDI races, with no legal authority to do so, CDI is intentionally and unjustifiably interfering with Baffert's contractual relationship with owners and his employees, robbing from him the advantages, economic or otherwise, he would have derived had been able to use his Kentucky license to race on CDI tracks.

195.   As a result of this interference, Baffert has suffered damages exceeding $75,000 due to CDI's interference with his reasonable expectation of economic advantages and depriving him of the opportunities other similarly situated licensed trainers have to participate and earn monies from purses at CDI tracks.

**COUNT 6**
**(Tortious Interference with Prospective Business Relations)**
**(CDI, Carstanjen)**

196.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 195
as though fully set forth herein.

197.    Baffert, as a licensed Thoroughbred racehorse trainer who has been training horses
for over 46 years, had several valid business relationships and the expectation of business
relationships with racehorse owners who relied upon Baffert for the training, care for, and racing
of their racehorses.

198.    At the time of Baffert's suspension, CDI was aware that Baffert had a reasonable
expectation of economic advantage from his business relationships with several racehorse owners
who rely upon Baffert for the training, care, and racing of their racehorses, including, but not
limited to, Spendthrift Farm, MyRacehorse Stable, Winstar Farm, Juddmonte Farms, and Gary
West.

199.    CDI intentionally interfered with these valid business relationships and the
expectation of valid business relationships.

200.    CDI's targeted, unprecedented suspension was enacted with improper motives of
interfering with these relationships, destroying Baffert's reputation, and ending Baffert's career,
and was accomplished through independently unlawful means.

201.    CDI's targeted, unprecedented suspension is neither necessary nor reasonably
tailored to further its purported justification of protecting its brand. CDI's prohibition against
Baffert-trained *horses* gaining points for the Kentucky Derby precludes Baffert from training a
horse during the qualifying period with the owner's understanding that a *different* trainer must
enter the horse in the Kentucky Derby. The *vast* majority of these qualifying races occur not on

CDI properties but on independent venues of national acclaim. The intent and effect of this rule was to discourage owners from contracting with Baffert to enter Derby-eligible horses in prominent racing venues that CDI does not control.

202.     CDI's suspension of Baffert caused racehorse owners to cancel or threaten to cancel training agreements between them and Baffert, including, but not limited to, Spendthrift Farm, MyRacehorse Stable, Winstar Farm, Juddmonte Farms, and Gary West.

203.     Baffert has suffered damages exceeding $75,000 due to CDI's interference with his reasonable expectation of economic advantages and depriving him of the opportunities other similarly situated licensed trainers have to participate and earn monies from purses at CDI tracks.

### COUNT 7
### (Declaratory Judgment)
### (All Defendants)

204.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 203 as though fully set forth herein.

205.     An actual case or controversy exists between Baffert and CDI with regard to whether CDI may lawfully suspend Baffert for definite or indefinite periods of time from CDI race tracks.

206.     This Court should enter a Declaratory Judgment that CDI is prohibited from: (a) denying racehorses owned and/or trained by Baffert entry into races contested at racetracks in Kentucky and elsewhere, including, but not limited to, Churchill Downs, Turfway Park, and Oak Groves; (b) denying Baffert the privileges of the grounds of the foregoing racetracks; (c) denying Baffert stall space at CDI racetracks; (d) prohibiting Baffert and/or any horse trained directly or indirectly by him and/or Bob Baffert Racing Stables, Inc., from earning points to qualify for the

Kentucky Derby; and (e) refusing to recognize qualifying points that Baffert-trained horses have already earned for the upcoming Kentucky Derby.

## COUNT 8
### (Preliminary and Permanent Injunction)
### (All Defendants)

207.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 206 as though fully set forth herein.

208.    As a result of CDI's unlawful conduct, Baffert will suffer imminent and irreparable harm including, but not limited to, the loss of unique business opportunities, the loss of customer goodwill, the loss of unique winnings in prestigious competitions, and reputational harm. Further, Baffert will forever lose the substantial time and money invested in particular horses trained for the Kentucky Derby, Kentucky Oaks, and other prestigious races. Because eligibility to those races is restricted by age, barring them now means barring them forever.

209.    Baffert does not have an adequate remedy at law or otherwise for the continuing damage and irreparable harm caused by CDI to his reputation and his ability to pursue his chosen careen and livelihood through his property interest in his State-issued license.

210.    Baffert is substantially likely to prevail on his claims against Defendants, as discussed in Plaintiffs' Motion for a Preliminary Injunction filed contemporaneously with this Motion.

211.    Because the terms of CDI's suspension include periods of time when Baffert's license will necessarily be in good standing with the Racing Commission, neither the public nor CDI would be harmed if Baffert were allowed to continue to participate in CDI races while a final determination in the proceeding before the Racing Commission is pending. CDI can take alternative precautions, including pretesting requirements, to protect its interest and brand.

Furthermore, CDI is already protecting its interests; qualifying points for *any* trainer are conditioned upon compliance with medication rules in the races where those points are at stake.

212.    Finally, the public interest favors the fair and equal enforcement of Racing Commission regulations on trainers. Permitting CDI's actions would allow the Racing Commission to abdicate its constitutional responsibilities to afford licensees due process of law. The Racing Commission could lawfully leak alleged positives to the press, accede to CDI's judgment of what constitutes the appropriate punishment in its uncontrolled discretion, and then impose a nominal sanction. The due process clause, not to mention the Racing Commission's "forceful control" of horse racing, is not so flimsy.

## DEMAND FOR RELIEF

WHEREFORE, Baffert seeks judgment in his favor as follows:

A.    A preliminary injunction and thereafter a permanent injunction enjoining CDI from (1) suspending Baffert from CDI tracks and races, (2) denying him the privilege of the grounds at CDI tracks, (3) denying him stall space at CDI tracks, (4) prohibiting Baffert and/or any horse trained directly or indirectly by him and/or Bob Baffert Racing Stables, Inc., from earning points to qualify for the Kentucky Derby, and (5) refusing to recognize points Baffert-trained horses have already earned for the upcoming Kentucky Derby;

B.    A declaratory judgment under 28 U.S.C. § 2201, *et seq.*, and an order from the Court declaring that CDI violated Baffert's constitutional right to due process of law and prohibiting CDI from unilaterally suspending or revoking Baffert's license;

C.    Damages exceeding $75,000, including punitive damages pursuant to 42 U.S.C. § 1983 and treble damages pursuant to 15 U.S.C. § 15, but in an amount to be proven at trial;

D.    Costs incurred herein, including reasonable attorney's fees; and

E.       Any further relief to which a jury determines he may be entitled.

Respectfully submitted,


**MILLER, GRIFFIN & MARKS, PSC**

*/s/  Carroll M. Redford, III*
Michael D. Meuser
Carroll M. Redford, III
Elizabeth C. Woodford
Security Trust Building
271 W. Short Street, Suite 600
Lexington, Kentucky, 40507 U.S.A.
Phone: (859) 255-6676
Fax: (859) 259-1562
mmeuser@kentuckylaw.com

and

**BREWSTER & DE ANGELIS, P.L.L.C.**
Clark O. Brewster, OBA #1114
Guy A. Fortney, OBA #17027
Joseph C. De Angelis, OBA #34142
2617 East 21st Street
Tulsa, Oklahoma 74114
(918) 742-2021 Office; (918) 742-2197 Fax
cbrewster@brewsterlaw.com
***Attorneys for Plaintiffs***
Pro Hac Admission Pending