UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BOB BAFFERT, AND BOB BAFFERT                                      Plaintiffs
RACING STABLES, INC

v.                                                    Civil Action No. 3:22-cv-123-RGJ

CHURCHILL DOWNS, INC., WILLIAM C.                                 Defendants
CARSTANJEN, and R. ALEX RANKIN

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Bob Baffert ("Baffert") and Bob Baffert Racing Stables, Inc. (together "Baffert" or "Plaintiffs") moved to disqualify the Undersigned pursuant to 28 U.S.C. §§ 144 and 455. [DE 66]. Defendants Churchill Downs, Inc. ("CDI"), William C. Carstanjen ("Carstanjen"), and R. Alex Rankin ("Rankin" together with CDI and Carstanjen, "Defendants") responded. [DE 67]. For the reasons below, Plaintiffs' Motion to Disqualify Trial Judge [DE 66] is **DENIED**.

I.       **BACKGROUND**

A.       **Baffert's Claims in the Current Lawsuit.**

Because a motion to recuse or disqualify a judge is evaluated based on the judge's alleged personal relationship to the subject matter in controversy and the parties to the proceeding, it is first necessary to clarify Plaintiffs' allegations specific to this lawsuit.

1.      *What this lawsuit is about.*

Plaintiffs entered Medina Spirit in the 147th running of the Kentucky Derby. [DE 1 at 19]. As a condition for entry in the Kentucky Derby, Baffert signed the Rules and Conditions for Racing and Training, which expressly incorporated all Kentucky Horse Racing Commission ("KHRC") rules and regulations as well as the Spring Meet 2021 Condition Book. [DE 51 at 3219, 3226].

1

Baffert also signed the CDI Stall Application that included conditions for stabling horses and entering races. [DE 51-8]. On May 1, 2021, Medina Spirt won the 2021 Kentucky Derby. [DE 1 at 19]. Following the race, Medina Spirit tested positive for betamethasone. [*Id.* at 20–21].

On May 9, 2021, CDI issued a statement that it was CDI's understanding that Medina Spirit's post-race sample violated the Commonwealth of Kentucky's equine medication protocols. [*Id.* at 22]. As a result, CDI suspended Baffert from entering any horses at Churchill Downs Racetrack for an indefinite period. [*Id.* at 22–23]. On June 2, 2021, after Baffert's attorneys confirmed the presence of betamethasone in Medina Spirit's blood, CDI announced that Baffert, and any trainer directly or indirectly employed by Plaintiffs, was suspended from entering horses in races or applying for stall occupancy at all CDI-owned racetracks for two years. [*Id.* at 23–24].

On September 10, 2021, CDI instituted a new rule, prohibiting any horse trained by a person suspended at Churchill Downs from earning points to qualify for the Kentucky Derby or the Kentucky Oaks, even if those races were not held at CDI properties. [*Id.*]. Under the rules adopted by the 2023 Kentucky Derby, horses under the care of a trainer suspended by CDI must be transferred by February 28, 2023, to be eligible for qualifying points. [DE 67-4 at 4756].

On February 28, 2022, Plaintiffs filed this action. [DE 1]. The Complaint articulates eight causes of action: (1) violation of 42 U.S.C. § 1983, (2) unlawful exclusion, (3) unlawful conspiracy in restraint of trade under 15 U.S.C. §§ 1, 15, and 26, (4) unlawful use of monopoly power under 15 U.S.C. §§ 2, 15, and 26, (5) tortious interference with contractual relations, (6) tortious interference with prospective business, (7) declaratory judgment, and (8) a preliminary and permanent injunction. [*Id.*]. In sum, this case is about CDI's two-year suspension of Baffert from participating in races or occupying stall space at its racetracks for violating CDI's terms and conditions for racing as well as equine medication protocols.

2

### *2. What this lawsuit is NOT about.*

After Medina Spirit tested positive for betamethasone at the Derby there have been multiple inquiries and legal actions in various jurisdictions surrounding the source of the positive test, Baffert's actions, and whether those actions and the positive test violated various racing commission regulations.  Specifically, the KHRC investigated whether the positive test violated their rules and regulations.  [*Id.* at 28–29].  After a hearing, the KHRC found that a violation occurred and imposed a 90-day suspension.  [*Id.*].  Various appeals followed through the KHRC, the Franklin Circuit Court, and the Kentucky Court of Appeals.[1]  [DE 41 at 1371].  The New York Racing Association ("NYRA") held a similar hearing and imposed a 365-day suspension.  [*Id.*].  Various appeals followed including Baffert's suit against NYRA in a New York federal court.[2]

These cases, violations, and suspensions are **NOT** before this Court.  Whether Plaintiffs violated KHRC or NYRA rules and regulations is wholly irrelevant to the § 1983, unlawful exclusion, antitrust, and tortious interference claims against CDI at issue here.  [*Id.*].  The Court need not make any findings about the KHRC, NYRA, or New York proceedings or whether the betamethasone positive test was or should have violated any racing regulations.  Both KHRC and NYRA determined that their racing rules and regulations were breached and issued suspensions. The New York case was ultimately dismissed, granting an injunction to Baffert on the NYRA's initial suspension in May 2021 but declining to enjoin the NYRA's renewed September 2021 suspension. This Court need not, will not, and has no jurisdiction to retry any of those proceedings. This case is about CDI's actions, CDI's Rules and Conditions for Racing and Training and other

---

[1] The KHRC held an evidentiary hearing, but it has not yet issued a decision.  [DE 50 at 3190].
[2] The Jockey Club filed an amicus brief taking a position opposing Baffert in the New York case.

contractual agreements between Baffert and CDI, not the inquiries by KHRC or NYRA or action taken in the New York case.

### B.      Procedural Background

On December 15, 2022, Plaintiffs filed a renewed motion for a preliminary injunction after voluntarily withdrawing their first motion for preliminary injunction nine months prior.  [DE 41; DE 5].  The Court held an evidentiary hearing on February 2 and 3, 2023 on Plaintiffs' Renewed Motion for a Preliminary Injunction.  [DE 65]; Feb. 2–3, 2023, Hrg. Tr., 1:1–2.  Before the hearing, the parties agreed to timing limits of two hours each for opening statements, direct examination of witnesses, cross-examination of witnesses, and closing statement.  [DE 65 at 4542].

In an effort to guide discussion, the Court listed 10 topics where additional evidence and argument would be helpful, including: (1) Plaintiffs' irreparable injury, (2) cause for Plaintiffs' delay in moving for a preliminary injunction, (3) the earliest date Plaintiffs' renewed motion for a preliminary injunction could have been filed, (4) the nexus test under the state action doctrine, (5) any distinguishable characteristics of relevant Sixth Circuit and Kentucky law, (6) the value of Baffert's Kentucky trainer's license, (7) contracts between Plaintiffs and CDI, (8) jurisdiction over bans related to CDI tracks in Louisiana, (9) when Plaintiffs last raced in Louisiana, and (10) additional detail on Plaintiffs' antitrust injury.  Feb. 2–3, 2023, Hrg. Tr., 1:1–2.  None of these topics touched on betamethasone or the suspensions issued by KHRC or NYRA.

Plaintiffs spent their entire two hours on opening statements and did not call either of their enumerated witnesses, Baffert or Dr. Clara Fenger. [DE 65 at 4542].  Plaintiffs' counsel, Clark Brewster ("Brewster"), focused almost exclusively on whether Plaintiffs violated the KHRC's rules and regulations related to the use of betamethasone for the entire first hour, only then to turn the presentation to Joseph DeAngelis with less than an hour remaining to address the "legal side."

4

Feb. 2–3, 2023, Hrg. Tr., 37:11–16 ("I'm going to turn it over to Mr. DeAngelis for the legal side of this.").   After two hours elapsed, the Court notified Plaintiffs that they had exhausted their agreed upon time and recommended they confer with Defendants during a brief recess.   *Id.* at 74:16–75:11.

The parties failed to come to a consensus during the recess, and as a result the Court continued to abide by their original agreement for division of hearing time.   *Id.* at 75:12–78:6.   The Court allowed Defendants to begin their presentation as Plaintiffs had exhausted their two hours. [DE 65 at 4542–43].   The Court heard Defendants' opening statement and direct testimony as well as Brewster's cross-examination of one defense witness, William Farmer, who was unavailable the next day.   [*Id.*].   The Court allowed the hearing to continue into the next day.

The Court began the hearing on February 3 by reiterating the relevant issues.   "We spent an inordinate amount of time yesterday discussing the issue of whether or not there was a violation of the Kentucky Horse Racing Commission rules.   We're not going to talk about that today."   Feb. 2–3, 2023, Hrg. Tr., 138:25–138:21.   The Court continued, "[t]he only things I want to hear about today have to do with the preliminary injunction."   *Id.* at 139:6–8.   At this point, Defendants had not yet exhausted their two hours and Plaintiffs had far exceeded theirs, which now included Farmer's cross-examination.   *See id.* at 3:22–25.   Accordingly, the Court explained that Defendants would be allowed to finish their presentation and Plaintiffs then could return to any unaddressed issues after that.   *See id.* at 140:21–139:3.   The Court then granted Plaintiffs leave to go outside the scope of direct examination while questioning Baffert.   *Id.* at 141:1–8.   The Court heard sworn testimony from two Defense witnesses on February 3, Baffert and Michael Anderson.   [DE 65].

During a sidebar, Plaintiffs' counsel implied that the Court's awareness of a case resulted from *ex parte* communications with Defendants' counsel.   The Court stated that the case was a

published case involving one of the parties which the Court had independently found and reviewed on Westlaw and dismissed the sidebar.  Plaintiffs declined to call any other witnesses and the Court then took the matter under submission.

The next morning, Monday, February 6, 2023, the Court was copied on an email exchange between the parties where Plaintiffs' counsel again appeared to allege *ex parte* communications between the Court and Defendants' counsel.  Brewster sent the following to defense counsel:

> Gentlemen,
>
> It was apparent this morning that the CDI lawyers had communicated with someone in the Judge's chambers to learn of a reversal in the Judge's position regarding the order of witnesses this morning. Depending upon your reply I am considering notifying the marshal's office for an inquiry.
>
> Clark Brewster

[DE 66-1 at 4563].  Defendants responded and copied the Courtroom Deputy:

> Dear Mr. Brewster:
>
> We write in response to your email below.  You have accused opposing counsel (and, by implication, the Court) of *ex parte* communications concerning the order of witnesses.  Your accusation is false.  To be clear, there were no *ex parte* communications between defense counsel and the Court.  As we explained to you this morning, our understanding of the order of witnesses was based on the Court's statements on the record, in open court, yesterday.
>
> This is not the first time today that you made a false accusation of *ex parte* communications.  I understand that, at sidebar, you insinuated that the Court learned about a public, reported decision through *ex parte* communications with counsel. That accusation was also false.  You have also threatened to file a false complaint with the U.S. Marshals.
>
> Given the falsity and seriousness of your accusations, and the necessary implication that the Court was involved, we are copying Chambers on this email so that the Court is aware of the situation.
>
> Orin Snyder

[*Id.* at 4562–63].  With the Courtroom Deputy now copied on the email chain, Brewster responded:

6

Regarding my discussion with Judge Jennings at the bench. . . . I simply inquired about the basis for her knowledge and she replied she was knowledgable [sic] because the case was a published decision. There was no insinuation and it was an honest inquiry. Your conduct this morning was extraordinary as you manned over the center podium 10 minutes before the court start and proclaimed you knew the judge was going to curtail the plaintiff's case and allow the defense to proceed with a named party on cross. It was apparent from your conduct that you knew more than was ever communicated to Plaintiff's counsel and your actions were abrupt and predatory. I will accept you [sic] word as an officer of the court that no member of the defense team communicated with the Judge's staff, including clerks.

[*Id.* at 4562]. [3]

In light of the sidebar and the email both suggesting *ex parte* communications without any basis as well as the behavior of counsel in physically jockeying for position at the podium, the Court issued an order addressing the seriousness of Brewster's accusations on February 8. [DE 65 at 4543]. The Court also explained that it had not engaged in *ex parte* communications with either side and warned that "any future conduct implicitly threatening the Court, attempting to create or fabricate a situation suggesting recusal, or made for other advantage or litigation tactic will not be tolerated and may result in a show cause hearing and disciplinary action." [*Id.*]. The Court's suggestion that Plaintiffs were attempting to contrive a recusal over *ex parte* communication resulted directly from Plaintiffs' counsel's conduct during and after the hearing.

Less than 48 hours after the Court warned the parties, Plaintiffs moved to disqualify the Undersigned based on her husband, Michael Patrick Jennings' ("Mr. Jennings"), contractual representation before the Kentucky State Legislature of two non-parties to this litigation, The Stronach Group ("TSG") and The Jockey Club. [DE 66]. Brewster alleges that The Jockey Club is adverse to Plaintiffs' interests because (1) it filed an amicus brief in an unrelated proceeding in a foreign jurisdiction critical of Baffert, [*id.* at 4549], (2) Rankin is a member or "steward" of The

---

[3] The single edit to Brewster's email omits the specific case law exchanged at the bench.

Jockey Club, [4] [*id.* at 4553; DE 66-1 at 4559], and (3) that a subsidiary of The Jockey Club is the majority owner of *Blood Horse Magazine*, which is allegedly "a constant source of negative articles about Mr. Baffert." [DE 66 at 4550].  Finally, Plaintiffs contend that TSG "have engaged in litigation to support racetrack ownership's purported right to exclude trainers for any reason without notice, hearing, or due process." [*Id.* at 4552].  Plaintiffs ultimately assert that Mr. Jennings' representation of these non-party entities creates a financial interest in the proceeding that is imputed to Mr. Jennings and the Undersigned.  And further, because The Jockey Club, and to a lesser extent, TSG, have an alleged "interest in the proceeding," the Undersigned is therefore biased and prejudiced against Brewster and Baffert.

The motion is supported by an affidavit signed by Brewster. [DE 66-1 ("Brewster Affidavit")].  The motion attaches an amicus brief the Jockey Club filed in litigation related to the NYRA suspension in the Eastern District of New York. [DE 66-2].  The amicus brief explained that The Jockey Club had "a unique interest in ensuring that when Thoroughbreds enter the breeding shed (where they determine the future of the breed through progeny), they do so with records uninfluenced by the effects of medication." [*Id.* at 4567].

### C.   Commonwealth Alliances, LLC and Mr. Jennings' Business Interests.

Commonwealth Alliances, LLC ("Commonwealth Alliances") is a bi-partisan government relations firm providing services related to the Kentucky state government to approximately 75 clients, spanning various industries and including both individual corporations and industry associations.  Mr. Jennings is the Managing Partner.

---

[4] Plaintiffs cite the website for The Jockey Club of the United Kingdom, not the entity at issue here, and the article cited lists Rankin as being elected to "membership." [DE 66 at 4554].  It does not define membership or mention a position as "steward."  As a result, it is unclear what Rankin's role is with the Jockey Club.  However, there is no accusation that Rankin's role as a director of CDI is in any way for purpose of representation of The Jockey Club or vice versa.

During the 2021 legislative session, Commonwealth Alliances began representing TSG in relation to proposed gaming legislation including historical horse racing.[5] TSG owns several horse racing tracks including tracks in Maryland, Florida, and California and has various other business and agriculture investments, including interests in para-mutual wagering. As required by Kentucky statutes governing Legislative Agents,[6] both Commonwealth Alliances and TSG filed ethics reports with the Kentucky Legislative Ethics Commission. TSG listed the scope of its lobbing efforts in Kentucky as issues related to historical horse racing, taxation, and related bills. Commonwealth Alliances listed its scope of work for TSG as issues relating to gaming and historical horse racing. Commonwealth Alliances has an arm's-length contract for services with TSG and, as a partner in Commonwealth Alliances, Mr. Jennings derives some portion of this income from TSG for contractual services. He holds no ownership interest in TSG and has no management role in the entity. He is a third-party contractor for a specific scope of services.

During the 2022 legislative session, in approximately January 2022, Commonwealth Alliances began representing The Jockey Club on proposed legislation effecting the breeding of thoroughbreds and the registration of horses with The Jockey Club. The Jockey Club is an organization involved in the Thoroughbred breeding and racing industry, with its primary function being the maintenance of *The American Stud Book.* As required, both Commonwealth Alliances and The Jockey Club filed with the Legislative Ethics Commission. The Jockey Club listed its

---

[5] Historical horse racing generally refers to gambling that allows players to bet on replays of previously run horse races. Such gambling typically exists in the form of electronic machines which instead of randomized winners, use prior horse races to determine winners. John Mehaffey, *Historical Horse Racing Machines: How They Work*, https://www.bettingusa.com/historical-horse-racing-machines/ (last visited Feb. 16, 2023).

[6] Under KRS 6.611(23)(a) "Legislative agent" means any individual who is engaged: 1. during at least a portion of his or her time to lobby as one of his or her official responsibilities; or 2. In lobbying activities as a legislative liaison of an association, coalition, or public interest entity formed for the purpose of promoting or otherwise influencing legislation. Ky. Rev. Stat. Ann. § 6.611 (West).

scope of lobbying interests as HB 496, a bill relating to thoroughbred registration and restrictions on the number of mares that can be bred to a stallion, and Commonwealth Alliances listed its scope of lobbying efforts as issues related to thoroughbred registration.  Commonwealth Alliances has an arm's-length contract for services with The Jockey Club and, as a partner in Commonwealth Alliances, Mr. Jennings derives some portion of this income from The Jockey Club's payments under the contract.  He holds no ownership interest in The Jockey Club and has no management role in the entity.  He is a third-party contractor for a specific scope of services.

Mr. Jennings' contact at The Jockey Club has been its President, who is the only individual Mr. Jennings interviewed with when hired.  No interviews were done with any other Jockey Club members.  Mr. Jennings was neither individually introduced to Rankin during his representation of the Jockey Club nor does Mr. Jennings personally know Rankin.

## II.     MOTION TO DISQUALIFY TRIAL JUDGE [DE 66]

### A.  Standard of Review

"A district judge is presumed to be impartial, and the party challenging such impartiality bears 'the substantial burden of showing otherwise.'" *Pharmacy Records v. Nassar*, No. 05-cv-72126, 2008 WL 4965337, at *3 (E.D. Mich. Nov.18, 2008) (quoting *United States v. Denton*, 434 F.3d 1104, 1111 (8th Cir. 2006) and in turn quoting *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003)); *Scott v. Metro. Healthcare Corp.,* 234 F. App'x 341, 352 (6th Cir. 2007). "The burden is not on the judge to prove that he is impartial." *Id.*  "The standard is an objective one." *United States v. Gallion,* No. 07-39(WOB), 2008 WL 1904669, at *2 (E.D. Ky. Apr. 29, 2008) (citing *Liteky v. United States*, 510 U.S. 540, 548 (1994)). "[T]he judge need not recuse himself based on the subjective view of a party no matter how strongly that view is held." *Id.* (quoting *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990), and citing *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir. 1992)). "Indeed, there 'is as much obligation for

a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is.'" *Id.*; *see also Laird v. Tatum*, 409 U.S. 824, 837 (1972) (noting "equal duty" principle"); *United States v. Angelus*, 258 F. App'x 840–42 (6th Cir. 2007) ("Although a judge is obliged to disqualify himself when there is a close question concerning his impartiality . . . he has an equally strong duty to sit where disqualification is not required) (inner quotations and citations omitted); *Hinman v. Rogers*, 831 F.2d 937, 939–40 (10th Cir. 1987) (collecting cases); *Fharmacy Records v. Nasser*, 572 F. Supp. 2d 869, 876 (E.D. Mich. 2008) ("[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited.") (citation omitted).

### B. Timeliness of Plaintiffs' Motion

The Court must first address the timeliness of Plaintiffs' motion.  In assessing a motion to recuse, §§ 144 and 455 are subject to "a timeliness requirement."  *Layman v. United Parcel Serv., Inc.*, No. 3:17-CV-738-CRS, 2019 WL 3291567, at *1 (W.D. Ky. July 22, 2019) (citing Wright & Miller, 13D Federal Practice and Procedure § 3550 (3d ed. 2019) (collecting cases)).  "This timeliness requirement applies to matters that are public knowledge, even if the movant does not in fact know them."  *Id.* at 2 (citing *Goward v. United States*, 569 F. App'x 408, 410–11 (6th Cir. 2014)); *United States v. Siegelman*, 640 F.3d 1159, 1188 (11th Cir. 2011) ("The rule has been applied when the facts upon which the motion relies are public knowledge, even if the movant does not know them.") (citation omitted); *United States v. Sypher*, No. 3:09-CR-00085, 2010 WL 5393849, at *2 (W.D. Ky. Dec. 22, 2010), *aff'd*, 684 F.3d 622 (6th Cir. 2012).  Courts have held that the purpose of this rule "is to 'conserve judicial resources and prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge.'"  *Siegelman*, 640 F.3d at 1188 (citing *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997)).

Plaintiffs contend that they never considered moving for recusal until the Court issued its February 8 Order warning counsel.  [DE 66-1 at 4558].  Brewster states he then "searched the internet" and "discovered" Mr. Jennings' representation of The Jockey Club and TSG.  [*Id.* at 4558–59].  Less than 48 hours after the Court issued its Order, Plaintiffs moved to disqualify and filed the Brewster Affidavit.  [*Id.*].

The timing of the motion raises questions, as noted in Defendants' response brief.  [DE 67 at 4657].  Information found from "searching the internet" is public information.  *Layman*, 2019 WL 3291567, at *1.  Moreover, much of the information cited is subject to state ethics reporting requirements, is publicly available, and is summarized by news outlets routinely throughout the year.  [*See* DE 67-3].  The Brewster Affidavit suggests that Mr. Jennings' representation of The Jockey Club began around the same time this action began.  [DE 66-1 at 4558–59].  Mr. Jennings started representing TSG in 2021.  This action began February 28, 2022.  [DE 1].  Accordingly, Plaintiffs had an obligation to bring any legitimate motion to recuse approximately one year ago.  *See Layman*, 2019 WL 3291567, at *1.  The Court finds that Plaintiffs' one-year delay fails to meet the timeliness requirement.  *See id.*  Yet the Court will continue to examine the merits of Plaintiffs' claims under §§ 144 and 455 out of an abundance of caution and taking Brewster's affidavit in the light most favorable to Plaintiffs.

### C.  Disqualification Pursuant to 28 U.S.C. § 144

#### 1.  Standard

28 U.S.C. § 144 states:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

In order to find that recusal is warranted under this statute, the Court must first establish that the party seeking reassignment has complied with all the requirements of §144 and then determine whether the affidavit is "sufficient." *RIT Rescue & Escape Sys., Inc. v. Fire Innovations, LLC*, No. 1:08CV1101, 2008 WL 5263694, at *1 (N.D. Ohio Dec. 16, 2008) (citing *Liberis v. Craig*, 845 F.2d 326 (6th Cir. 1988)).

"The requirements of § 144 are strictly construed to prevent abuse." *Scott*, 234 F. App'x a at 353. The Sixth Circuit has held that § 144 requires a "party" to execute the affidavit. *Roberts v. Bailar*, 625 F.2d 125, 128 (6th Cir. 1980). Motions to recuse under § 144 are invalid from the time they are filed if the affidavit was not signed by a party. *See id.* (citing *U.S. ex rel. Wilson v. Coughlin*, 472 F.2d 100, 104 (7th Cir. 1973); *Giebe v. Pence*, 431 F.2d 942, 943 (9th Cir. 1970); *Paschall v. Mayone*, 454 F. Supp. 1289, 1299–301 (S.D.N.Y. 1978) (affirming denial of § 144 disqualification motions accompanied only by affidavit of counsel)). "[A] motion for recusal should [also] be accompanied by . . . a separate certificate that the affidavit was made in good faith." *Scott*, 234 F. App'x at 353 (quotation omitted). Failure to include a separate certificate of good faith is fatal to a motion to recuse made under § 144. *See, e.g.*, *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, No. 612CV00091GFVT-HAI, 2018 WL 7288756, at *1 (E.D. Ky. Nov. 29, 2018) (Because "the motion did not contain a 'certificate from the counsel of record stating that it is made in good faith,' as required by § 144," "the motion must be denied.").

If the requirements of the statute are met, then the court must determine whether the party has filed a "sufficient affidavit." 28 U.S.C. §144. For a § 144 affidavit to be sufficient, it must

13

allege specific facts that a reasonable person would believe indicate that a judge is personally biased or prejudiced against the declarant. *RIT Rescue & Escape Sys., Inc.,* 2008 WL 5263694, at *1. The inquiry into the sufficiency of the affidavit focuses on the facial sufficiency and not the accuracy of the facts asserted. *See United States v. Montecalvo*, 545 F.2d 684, 685 (9th Cir. 1976). In assessing a § 144 affidavit, the district court must accept the factual allegations as true. *Scott*, 234 F. App'x at 352; *United States v. Cohen*, 644 F. Supp. 113, 116 (E.D. Mich. 1986). That said, the court is *not* bound to accept the conclusions that the affiant draws from those facts. *RIT Rescue & Escape Sys., Inc.,* 2008 WL 5263694, at *2. The district judge only has a duty to recuse once the legal sufficiency of the affidavit is established. *See United States v. Azhocar*, 581 F.2d 735, 738 (9th Cir. 1978).

## 2. *Analysis*

As a threshold matter, Plaintiffs' affidavit fails to meet the requirements of the statute. First, Plaintiffs' motion must include an affidavit signed by a "party." *See* 28 U.S.C. § 144. Here, the Brewster Affidavit was signed by Brewster, Plaintiffs' counsel. [DE 66-1 at 4561]. The Sixth Circuit has held that § 144 motions cannot be accompanied only by an affidavit from counsel. *See Roberts*, 625 F.2d at 128 (citing *Paschall*, 454 F. Supp. at 1299–301). Second, the Brewster Affidavit states it is made in good faith in the body of the document, but Plaintiffs fail to attach a separate certificate that the Brewster Affidavit was made in good faith. *See Scott*, 234 F. App'x at 353. Failure to include a separate certificate is fatal to a motion under § 144. *See New London Tobacco Mkt., Inc.*, 2018 WL 7288756, at *1. Because the Brewster Affidavit was not signed by a party and because it failed to include a separate certificate of good faith, the affidavit was "invalid under § 144 from the time that it was filed." *Roberts*, 625 F.2d at 128.

14

As a result of these deficiencies, the Court's analysis needs not proceed further as the Undersigned has no duty to recuse under § 144. *See Azhocar*, 581 F.2d at 738. That said, the Court addresses the sufficiency of the affidavit below as Plaintiffs' arguments under § 144 are the same as those put forth under § 455(a) and (b)(1) and §§ 144 and 455 must be construed *in pari materia.*[7] *Youn v. Track, Inc.*, 324 F.3d 409, 422–23 (6th Cir. 2003) (citation and internal quotations omitted). For the reasons below, even if Plaintiffs' counsel's affidavit satisfied the facial requirements of §144, Plaintiffs' motion still fails as the affidavit lacks "sufficiency." !

### D. Disqualification Pursuant to 28 U.S.C. § 455

#### 1. Standard

Section 455(a) of Title 28 provides that a United States judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Section 455(b) designates particularized situations in which recusal is mandated. *Union Planters Bank v. L & J Dev. Co.,* 115 F.3d 378, 382 (6th Cir. 1997). Plaintiffs cite the following subsections of § 455(b) as applying to their allegations.

> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
>
> * * *
>
> (4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

---

[7] "The difference between §§ 144 and 455 is that section 455 is self-executing, requiring the judge to disqualify himself for personal bias in the absence of a party complaint." *Easley v. Univ. of Michigan Bd. of Regents,* 853 F.2d 1351,1356 (6th Cir. 1988) (quoting *United States v. Story*, 716 F.2d 1088, 1091 (6th Cir. 1983)).

15

(5)    He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

    i.    Is a party to the proceeding, or an officer, director, or trustee of a party;

    ii.    Is acting as a lawyer in the proceeding;

    iii.    Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

    iv.    Is to the judge's knowledge likely to be a material witness in the proceeding

28 U.S.C. § 455(b).

Under §455(c) a judge is under a statutory duty to "inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children." 28 U.S.C. § 455(c). "Scienter is not an element of a violation of § 455(a)," but knowledge is required under § 455(b). *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 (1988). A "financial interest" is defined as "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party[.]" 28 U.S.C. § 455(d)(4). Courts have interpreted "financial interest" to refer to a direct interest, not a "remote or contingent" interest. *In re Virginia Elec. & Power Co.*, 539 F.2d 357, 366–67 (4th Cir. 1976); *see also Scott*, 234 F. App'x at 357 ("[W]e we hold that 'disqualification is not required on the basis of [such] remote, contingent, indirect or speculative interests.'" *United States v. Bayless*, 201 F.3d 116, 127 (2d Cir. 2000)).

Because the safeguards of § 144's affidavit and certification-of-counsel requirements are lacking, "§ 455 does not require the judge to 'accept as true the allegations made by the party seeking recusal.'" *Scott*, 234 F. App'x at 353–54 (quoting *In re Martinez–Catala*, 129 F.3d 213, 220 (1st Cir. 1997)).

Rather, the district court may make the necessary factual findings and decide whether the facts warrant disqualification. When considering a § 455 recusal

16

request, "the judge is free to make credibility determinations, assign to the evidence what he believes to be its proper weight, and to contradict the evidence with facts drawn from his personal knowledge."

*Id.* at 354.

The standard under § 455 is objective. *Roberts*, 625 F.2d at 129. "[A] judge must recuse herself if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990); *see also Burley v. Gagacki*, 834 F.3d 606, 615–16 (6th Cir. 2016); *United States v. Adams*, 722 F.3d 788, 837 (6th Cir. 2013). Because the standard is objective, the judge need not recuse herself based on the subjective view of a party. *See Sammons*, 918 F.2d at 599. As a practical matter, the only basis for establishing bias or prejudice is an "extrajudicial source." *United States v. Howard*, 218 F.3d 556, 566 (6th Cir. 2000) (quoting *Liteky*, 510 U.S. 540).

### 2. *Analysis*

#### a.  28 U.S.C. §§ 144 and 455(a) and 455(b)(1)

Plaintiffs allege that Mr. Jennings' representation of TSG and The Jockey Club would cause a reasonable person to question the Undersigned's impartiality in this proceeding. [DE 66]. Plaintiffs also allege that Rankin has some interest in The Jockey Club that would suggest impropriety. [DE 66 at 4553; DE 66-1 at 4559]. Finally, Plaintiffs contend that counsel was treated disparately compared to Defendants at the evidentiary hearing. [DE 66-1 at 4560]. In response, Defendants contend that Plaintiffs' arguments are frivolous and do not create grounds for recusal. [DE 67 at 4660].

Under 28 U.S.C. §§ 144, 455(a), and (b)(1), a federal judge must disqualify herself from a proceeding where the judge "has a personal bias or prejudice either against [a party] or in favor of any adverse party," or "his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." 28 U.S.C. §§ 144, 455(a), (b)(1); *Story*, 716 F.2d

17

at 1091 (quoting *City of Cleveland v. Krupansky*, 619 F.2d 576, 578 (6th Cir. 1980) and stating

that "It is well settled that sections 144 and 455 'must be construed *in pari materia*'"); *Hughes*,

899 F.2d at 1501 (finding that Sections 144 and 455 are treated the same in the Sixth Circuit).

Personal bias as used in these sections is "prejudice that emanates from some source other

than participation in the proceedings or prior contact with related cases." *Fharmacy Records*, 572

F. Supp. 2d at 875 (quoting *United States v. Nelson*, 922 F.2d 311, 319–20 (6th Cir. 1990)).   It

may be predicated on extrajudicial sources such as the judge's background or associations.   *Id.*

Disqualification under § 144 as well as § 455(a) and (b) must be predicated upon extrajudicial

conduct rather than on judicial conduct." *Krupansky*, 619 F.2d at 578; *Youn*, 324 F.3d at 423; *see*

*generally*, *Liteky*, 510 U.S. 540. "Bias finding its source in the judge's view of the law or the facts

of the case itself is not sufficient to warrant disqualification." *Fharmacy Records*, 572 F. Supp.2d

at 875 (citing *Story*, 716 F.2d at 1090).

### *i.*       *Mr. Jennings' Representation of Non-Parties.*

First, Plaintiff alleges that the Undersigned must recuse because Mr. Jennings and his

colleagues at Commonwealth Alliances represented TSG and The Jockey Club during the 2022

legislative session in Kentucky.   [DE 66-1 at 4559–60].

"As a general proposition, the fact that the spouse or the spouse's business has a business

relationship with an entity that appears in an unrelated proceeding before the judge usually does

not require the judge's recusal." *Garrett v. Ohio State Univ.*, No. 2:18-CV-692, 2021 WL 7186381,

at \*5 (S.D. Ohio Sept. 22, 2021), *aff'd*, No. 21-3972, 2023 WL 2012158 (6th Cir. Feb. 15, 2023)

(citing Guide to Judiciary Policy, Vol. 2, Ch. 2, Advisory Opinion No. 107).   Even still,

> When a judge knows that a client of the judge's spouse or the spouse's business
> appears before the judge, the Committee has advised that the judge should evaluate
> certain factors to determine whether recusal is warranted. These factors include: (1)
> the spouse's personal role or lack of personal role in providing services to the client,

(2) whether the services provided to the client are substantial and ongoing, (3) the nature of the client's relationship to the spouse or the spouse's business, and (4) the financial connection between the client, the business, and the judge's spouse (including the percentage of business revenue the client provides and the amount of compensation the spouse earns from the client). Additionally, judges should consider recusal whenever they become aware of circumstances suggesting that the hiring of the spouse or the spouse's business may have been influenced by the judge's position.

*Id.*

Neither TSG nor The Jockey Club are parties to this litigation. Not only are they not parties, but they are also not witnesses in this matter. *United States v. Turner*, No. CRIM. 05-02, 2005 WL 3234331, at *1 (E.D. Ky. Nov. 30, 2005). As a result, the policy guidance is not directly applicable because any connection to Mr. Jennings' business is farther removed, yet reviewing the factors further demonstrates that his representation is not grounds for recusal. (1) Mr. Jennings' clients are not appearing before the Undersigned in this case. (2) The work performed by Mr. Jennings for TSG and The Jockey Club is unrelated to this case or even the subject matter of this litigation. *See also* [DE 67-4 at 4754 ("Commonwealth's representation of The Jockey Club is limited solely to legislation introduced during the 2022 legislative session and is in no way related to any matter currently pending before a court.")]. (3) The clients' relationship to Mr. Jennings' business is solely through an arm's-length contract for specific services. (4) These clients are just two of approximately 75 clients serviced by Mr. Jennings and Commonwealth Alliances from which Mr. Jennings derives income. (5) Both clients are relatively new representations and not stalwarts of Mr. Jennings' business. (6) There is no allegation, nor could there be any evidence, that Mr. Jennings was hired by these two clients because of the Undersigned's position. Mr. Jennings and these two clients have an arm's-length business relationship and no personal relationship. Based on these factors, there are no grounds for an objective person with knowledge of the facts to question the impartiality of the Court or for the Court to recuse on this basis.

### ii.   *The Jockey Club's Amicus Brief, Blood Horse Articles and TSG's Settled Litigation*

Plaintiffs also allege that The Jockey Club has a "clear interest" in this action because (1) they took a position against Baffert in the federal New York case in an amicus brief, (2) they own Blood Horse LLC, a horse racing magazine that has maligned Baffert's reputation, and (3) Rankin, a party to this case, is member or "steward" of The Jockey Club. As a result, Plaintiffs leapfrog to the conclusion that these positions, taken in matters unrelated to Mr. Jennings' representation and having nothing to do with his contract for services, impute a prejudice to the Undersigned against Plaintiffs.

First, as to the amicus brief, the NYRA action is irrelevant to this case as explained above and The Jockey Club's amicus brief has not been cited by the parties in the voluminous briefing in this case as it has no relevance to the issues here.  The Undersigned was rightfully unaware of its existence.[8]  The amicus brief in the NYRA action does not demonstrate that The Jockey Club has any financial interest in the action pending before this court and none has been identified.  The Jockey Club explained that it had "a unique interest in ensuring that when Thoroughbreds enter the breeding shed (where they determine the future of the breed through progeny), they do so with records uninfluenced by the effects of medication."  [DE 66-1 at 4567].  This interest is far removed from the contractual and antitrust issues in this case between CDI and Baffert.  This alleged interest is far too remote and speculative to raise a reasonable question as to the Court's impartiality in this case.  *Scott*, 234 F. App'x at 354.

Similarly, in relation to TSG, Brewster alleges that during the period of Mr. Jennings' representation of TSG in the Kentucky Legislature, "litigation was pending against TSG by Jerry

---

[8] The Court had no knowledge of The Jockey Club's amicus brief in the New York case. It would not be appropriate for the Court to independently research the facts of the case outside the information presented by the parties. *See* ABA Model Code of Judicial Conduct, according to ABA Formal Opinion 478.

Hollendorfer (a racehorse trainer) excluded from Santa Anita by TSG." [DE 66-1 at 4559]. Brewster then notes that the litigation settled in September of 2022. *Id.* at 4559. Again, The Undersigned was rightfully unaware of its existence. Mr. Jennings representation of TSG was in relation to gaming legislation, not its racetrack management. The fact that a different racetrack owner excluded a trainer in a different jurisdiction does not create some type of interest in the outcome of this litigation, especially because TSG's ligation is apparently concluded as settled. This alleged interest is far too remote and speculative to raise a reasonable question as to the Court's impartiality in this case. *Scott*, 234 F. App'x at 354.

Whether or not The Jockey Club or TSG has an opinion about the outcome of this case, the connection of that opinion to Mr. Jennings' work on unrelated matters through an arm-length contract for services and then to the Court is far too remote and speculative to raise a reasonable question as to the Court's impartiality. *Scott*, 234 F. App'x at 354.

Finally, Plaintiffs allege that The Jockey Club owns Blood Horse, LLC, a horse racing magazine that has published negative stories about Baffert.[9] Even if Blood Horse has published negative articles about Baffert, the connection from Blood Horse's negative publishing on Baffert to The Jockey Club's hiring of Mr. Jennings to lobby the Kentucky Legislature on a discrete issue not related to the present litigation, is far too remote to connect The Jockey Club to this litigation or provide grounds to question the Court's impartiality.

The Sixth Circuit addressed similar circumstances in *Scott* where the plaintiff sought recusal because the judge's wife worked for a law firm that represented a bank connected to the named defendant. 234 F. App'x at 354. The court held that a reasonable person would not question the district court's impartiality given the remoteness of the interest at issue. *See id.* at 357. The

---

[9] According to the corporate brochure [DE 66-3] attached to the Plaintiffs' motion, The Jockey Club Information Systems, Inc. has a majority interest in Blood Horse.

Brewster Affidavit ultimately alleges that Mr. Jennings and Commonwealth Alliances represented nonparties who filed an amicus brief in unrelated litigation in a foreign jurisdiction.  [DE 66-1]. Like *Scott*, the interests alleged are far too remote, indirect, and speculative.  *See* 234 F. App'x at 357; *see also Turner*, 2005 WL 3234331, at \*3 ("[T]his judge cannot recuse on the basis of such a remote connection to her husband's current employment. Thus, this judge's impartiality in this matter cannot be reasonably questioned on the basis that her husband has an interest in its outcome."). The Court finds, even accepting the Brewster Affidavit as true, that a reasonable person knowing all the facts and circumstances of Mr. Jennings' representation of The Jockey Club and TSG would not question the Undersigned's impartiality.  *See Hughes*, 899 F.2d at 1501.

### iii. *Rankin's Membership in The Jockey Club*

Plaintiffs also allege that Rankin's membership in The Jockey Club creates personal bias against Baffert based on Mr. Jennings business relationship with The Jockey Club.  [DE 66-1].[10] Even assuming Rankin holds some type of leadership position at The Jockey Club, neither party has alleged that Mr. Jennings or Commonwealth Alliances represents Rankin.  [*Id.*].  Nor have Plaintiffs alleged that Mr. Jennings was ever in contact with Rankin while he represented The Jockey Club.  [*Id.*].  As addressed above, there is no evidence that Rankin helped hire Mr. Jennings or that Mr. Jennings was hired because of the Undersigned's position.  There is no evidence that his position at CDI is in anyway tied to his membership in The Jockey Club, nor that any role at The Jockey Club is tied to CDI.  The Brewster Affidavit merely alleges that Rankin holds some role at an organization that is not a party to this case.  [*Id.*].  As in *Scott*, Mr. Jennings' alleged

---

[10] As with other facts alleged by Plaintiff in this motion, the Court rightfully had no reason to know if Rankin was a member of The Jockey Club. Again, it would not be appropriate for the Court to independently research the facts of the case outside the information presented by the parties. *See* ABA Model Code of Judicial Conduct, according to ABA Formal Opinion 478.

interest in Rankin, if any, or Mr. Rankin's interest in The Jockey Club is an interest too remote, indirect, and speculative to require disqualification. *See* 234 F. App'x at 357; *see also Turner*, 2005 WL 3234331, at *3. Accordingly, the Court finds that a reasonable person would not question the Undersigned's impartiality even if the Brewster Affidavit were accepted as true. *See Hughes*, 899 F.2d at 1501.

### iv. *Alleged Disparate Treatment of Plaintiffs' Counsel During Preliminary Injunction Hearing*

Finally, Plaintiffs' allegation that counsel was treated unfairly at the hearing, even accepted as true, would fail as a matter of law. [DE 66-1 at 4560]. Brewster argues the Court

> interrupted questioning, terminated counsel's argument, denied cross-examination on points raised on direct, and permitted defense counsel to commence the defense witness presentation by calling Mr. Baffert for cross before his lawyer was permitted to provide a direct exam and ultimately assisting defense counsel in raising objections.

[*Id.*]. In short, Brewster complains because the Court was acting in its judicial capacity and managing its courtroom. *See United States v. Sulik*, No. CR 5:18-019-DCR, 2020 WL 252990, at *5 (E.D. Ky. Jan. 16, 2020) ("Trial judges are afforded broad discretion in management of the courtroom.").

At the evidentiary hearing, the Court explained the specific evidence it wanted to hear in order to better inform its order on the preliminary injunction. Feb. 2–3, 2023, Hrg. Tr., 1:1–2. The Court gave this directive to both parties at the beginning of the hearing. *See id.* However, Plaintiffs did not follow the Court's direction and habitually put on evidence and made arguments that could only be relevant to proceedings before the KHRC. *See id.* at 3:22–39:22 (discussing KHRC's regulation of betamethasone); *id* at 115:2–135:2 (discussing regulation of betamethasone and the disposition of the KHRC's stewards' hearing); *id* at 223:10–225:8 (discussing Baffert's

conversation with Donald Trump).  This prompted the Court to, again, explain the relevant issues at the beginning of the hearing on February 3.  *See id.* at 138:25–141:8.

Plaintiffs' allegations fail as a matter of law.  The Sixth Circuit has held that a judge's statements during the proceedings cannot be the basis of recusal under §§ 144 or 455 because the alleged bias or prejudice must come from an extrajudicial source.  *See Youn*, 324 F.3d at 423; *see Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002) (finding that hostility toward defendant's trial counsel is not evidence of bias where it stemmed from events occurring in the course of the proceeding).  The bias cannot come from "participation in the proceedings."  *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251–52 (6th Cir. 1989).  Accordingly, Plaintiffs' allegations that the Undersigned must recuse because they were treated unfairly at the hearing fails as a matter of law.  *See, e.g.*, *Youn*, 324 F.3d at 423.

### b.  28 U.S.C. § 455(b)(4)

Plaintiffs allege that Mr. Jennings' representation of TSG and The Jockey Club creates a financial interest that requires recusal under 28 U.S.C. § 455(b)(4).  [DE 66 at 4546-51].  Defendants argue that any interest by the Undersigned is too remote to warrant recusal.  [DE 67 at 4660].

Plaintiffs cite to 28 U.S.C. § 455(b)(4) which provides that recusal is required if a judge "individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).

To begin, there is no allegation, nor could there be, that the Undersigned nor any member of her household has a financial interest in any **party** to this proceeding or in the subject matter of

the controversy.  This leaves only the allegation that some "other interest" could be substantially affected by the outcome of the proceeding.  28 U.S.C. § 455(b)(4).  The Brewster Affidavit alleges that Commonwealth Alliances and Mr. Jennings earned income from representing The Jockey Club and TSG.  [DE 66-1 at 4559–60].  Plaintiffs also alleged that The Jockey Club took an adverse position to Baffert in the NYRA action by filing an amicus brief in support of his New York suspension.  [*Id.*].

Even accepting these allegations as true, they suffer from the same deficiencies as Plaintiffs' allegations under §§ 455(a) and 455(b)(1).  Mr. Jennings earned income from The Jockey Club and TSG, but neither entity is a party, witness or amicus to this litigation.  [DE 66-1].  The Jockey Club's amicus brief was limited to litigation in a foreign jurisdiction.  [DE 66-2 at 4567].  The Jockey Club's interest in the NYRA action was limited to ensuring thoroughbreds enter the breeding shed with records uninfluenced by the effects of medication, an interest not at issue in this litigation regarding due process, contract and antitrust claims.  [*Id.*].  Even assuming The Jockey Club is adverse to Plaintiffs in the NYRA action, any connection to this case is remote.

Courts have repeatedly held that recusal is not required when the alleged financial interest or bias under § 455 is remote, contingent, or speculative.  *See Scott*, 234 F. App'x at 357 ("[W]e we hold that 'disqualification is not required on the basis of [such] remote, contingent, indirect or speculative interests.'"  *Bayless*, 201 F.3d at 127; *In re Virginia Elec. & Power Co.*, 539 F.2d at 366–67; *Turner*, 2005 WL 3234331, at *3 (citing *United States v. Morrison*, 153 F.3d 34, 48 (2d Cir. 1998) and *United States v. Thompson*, 76 F.3d 442, 451 (2d Cir. 1996)).  As the Sixth Circuit held in *Scott*, a judge whose spouse represents a client that is tangentially connected to a defendant is too "remote, contingent, indirect or speculative" as a basis for recusal.  234 F. App'x at 357. Plaintiffs have failed to allege that Mr. Jennings has a "financial interest" in the outcome of this

case.  28 U.S.C. § 455(b).  As a result, recusal is not required under § 455(b)(4).  *See Scott*, 234 F. App'x at 357.

c.   <u>28 U.S.C. § 455(b)(5)</u>

Finally, while the specific allegations are unclear to the Court, Plaintiffs cite 28 U.S.C. § 455(b)(5) as warranting recusal.  This statute provides that a judge should recuse if "he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

|    |    |
|----|----|
| i. | Is a party to the proceeding, or an officer, director, or trustee of a party; |
| ii. | Is acting as a lawyer in the proceeding; |
| iii. | Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; |
| iv. | Is to the judge's knowledge likely to be a material witness in the proceeding" |

Pursuant to 28 U.S.C.A. § 455(d)(2) "the degree of relationship is calculated according to the civil law system."  28 U.S.C.A. § 455(d)(2).  Third degree of relationship means the following persons: great-grandparent, grandparent, parent, uncle, aunt, brother, sister, child, grandchild, great-grandchild, nephew, and niece.  13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3548, at 607 n. 3 ("[T]he following persons are within the third degree of relationship: children; grandchildren; great-grandchildren; parents; grandparents; great-grandparents; uncles; aunts; brothers; sisters; nephews; and nieces.").

First, there are no allegations related to anyone other than the Undersigned and the Undersigned's spouse.  Neither the Undersigned nor Mr. Jennings is a party to this proceeding, or an officer, director or trustee of any party or holds any financial interest in any party.  Similarly, neither is acting as a lawyer in this proceeding.  Moreover, the Undersigned knows of no one in the third degree of relationship who has an interest that could be affected by the outcome of this

26

proceeding or is likely to be a material witness in this proceeding.  To the extent Plaintiffs cited to this statute, there exist no grounds for recusal.

### III.   CONCLUSION

Plaintiffs' motion fails for several reasons.  First, Plaintiffs failed to meet the timeliness requirement because the information regarding Mr. Jennings was publicly available, and Plaintiffs waited almost a year to bring this motion and only after the Court issued an order that counsel found to be an "extraordinary reaction" to counsels' behavior.  *See Layman*, 2019 WL 3291567, at *1.  Second, a party failed to sign the affidavit, see *Roberts*, 625 F.2d at 128, and counsel failed to attach a separate certificate of good faith, see *Scott*, 234 F. App'x at 353.  Continuing to the merits, Plaintiffs fail to allege facts that would lead a reasonable person to question the Undersigned's impartiality according to §§ 144 and 455.  *See Hughes*, 899 F.2d at 1501.  TSG and The Jockey Club are not parties or witnesses to this case.  Any connection to these nonparties by Mr. Jennings in his capacity as a third-party contractor on issues unrelated to this case is far too remote a connection for any reasonable person to find that the outcome of this litigation will benefit Mr. Jennings or put the Undersigned's impartiality in question.  Finally, Plaintiffs likewise fail to allege a financial interest in the outcome of this litigation that is not remote, contingent, or speculative.  *See Scott*, 234 F. App'x at 357.

The Undersigned takes seriously the Motion to Disqualify.  In all cases the Undersigned reviews the parties and subject matter diligently for conflicts.  I have no personal bias or prejudice against any party to this litigation and I have no extrajudicial knowledge about the facts or circumstances of this case or the subject matter of this litigation.  Additionally, neither I nor any member of my family has any financial interest in any of the parties or the outcome of this litigation.  And, after a deep search of the law and review of all briefings, I have found no statutory

or other reason for disqualification in the case before the Court and cannot recuse.  For the foregoing reasons, Plaintiffs' Motion to Disqualify Trial Judge [DE 66] is **DENIED**.[11]

Rebecca Grady Jennings, District Judge

United States District Court

February 17, 2023

---

[11]  Defendants encourage the Court to order a show cause hearing based on Plaintiffs' misconduct. It is true that the timing the motion to disqualify is questionable, coming after Plaintiffs' failed claims of *ex parte* communication and this Court's warning that such tactics would not be tolerated.  While the suggestion of a show cause hearing is well-taken, the Court will decline to do so at this time. The parties are encouraged to focus on the merits of the case. Should such issues continue, the Court will make every effort to protect the integrity of the proceedings in this and every case.