UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

BOB BAFFERT, AND BOB BAFFERT                                    *Plaintiffs*
RACING STABLES, INC

v.                                                             Civil Action No. 3:22-cv-123-RGJ

CHURCHILL DOWNS, INC., WILLIAM C.                              *Defendants*
CARSTANJEN, and R. ALEX RANKIN

* * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Bob Baffert ("Baffert") and Bob Baffert Racing Stables, Inc. (together with Baffert, "Plaintiffs") moved for a preliminary injunction against Defendants Churchill Downs, Inc. ("CDI"), William C. Carstanjen ("Carstanjen"), and R. Alex Rankin ("Rankin" together with CDI and Carstanjen, "Defendants") regarding Plaintiffs' suspension from CDI tracks. [DE 41]. Defendants responded [DE 50] and Plaintiffs replied [DE 54]. Defendants moved to dismiss Plaintiff's Complaint. [DE 36]. Plaintiffs responded in opposition [DE 39] and Defendants replied [DE 40]. Plaintiffs also moved unopposed for leave to exceed the page limitation in their response. [DE 37]. For the reasons below, Plaintiffs' Request for Leave to File Brief in Excess of 25 Pages [DE 37] is **GRANTED**, Defendants' Motion to Dismiss [DE 36] is **GRANTED in PART and DENIED in PART**, and Plaintiffs' Renewed Motion for a Preliminary Injunction [DE 41] is **DENIED**.

I.      **BACKGROUND**

Baffert is a resident of California and a nationally recognized thoroughbred trainer. [DE 1 at 5]. He holds a license issued by the Kentucky Horse Racing Commission ("KHRC") to enter horses into races and apply for stall occupancy at all racetracks in Kentucky. [*Id.* at 6]. CDI is a

1

for-profit corporation with its principal place of business in Louisville, Kentucky.  [*Id.*].  CDI is in the business of horseracing, online wagering, and gaming entertainment.  [*Id.* at 10].  Its flagship events include the Kentucky Derby and the Kentucky Oaks at its Churchill Downs Racetrack in Louisville.  [*Id.* at 6].  The Churchill Downs racetrack is owned by the City of Louisville and leased to CDI on a 30-year term that expires on December 31, 2032.  [*Id.* at 9].  Defendant Carstanjen is CDI's chief executive officer, and Defendant Rankin serves as chairman of CDI's board of directors.  [*Id.* at 7].

Plaintiffs entered Medina Spirit in the 147th running of the Kentucky Derby.  [*Id.* at 19].  As a condition for entry, Baffert signed the Rules and Conditions for Racing and Training, which expressly incorporated all KHRC rules and regulations.  [DE 51 at 3226].  The Rules and Conditions also expressly incorporated the Spring Meet 2021 Condition Book.  [*Id.* at 3219].  Baffert also signed the CDI Stall Application that included conditions for stabling horses and entering races.  [DE 51-8].  The KHRC approved Tyler Picklesimer ("Picklesimer") as the third steward for the race.  [DE 1 at 19].

On May 1, 2021, Medina Spirt won the Kentucky Derby.  [*Id.*].  Following the race, pursuant to 810 KAR 8:060, a KHRC veterinarian took samples from Medina Spirit to test for prohibited substances.  [*Id.* at 20].  On May 8, 2021, it became known to CDI that Medina Spirit had tested positive for betamethasone.  [*Id.* at 20–21].  Betamethasone is labeled as a Class C prohibited substance by the KHRC.  [*Id.* at 21].

On May 9, 2021, CDI issued a statement that CDI has come to understand that Medina Spirit's post-race sample violated the Commonwealth of Kentucky's equine medication protocols.  [*Id.* at 22].  As a result, Baffert would be immediately suspended from entering any horses at Churchill Downs Racetrack for an indefinite period of time.  [*Id.* at 22–23].  CDI cited the

seriousness of the offense and noted that if the KHRC's findings were confirmed, then the results of the 2021 Kentucky Derby would be invalidated.  [*Id.*].

On June 2, 2021, CDI announced that Baffert, and any trainer directly or indirectly employed by Plaintiffs, was suspended from entering horses in races or applying for stall occupancy at all CDI-owned racetracks for two years.  [*Id.* at 23].  CDI reserved the right to extend the period of its suspension.  [*Id.*].  This decision followed the confirmation by Plaintiffs' attorneys that Medina Spirit had tested positive for betamethasone following the 2021 Kentucky Derby.  [*Id.* at 23–24].  CDI's suspension makes Plaintiffs' horses ineligible for race entries and stabling privileges.  [*Id.*].  The terms of CDI's suspension do not prevent Baffert from entering the grounds or limit his right of access as a member of the general public to observe races on CDI properties. [*Id.* at 23–24].  Plaintiffs allege that they have been targeted where more severe violations by other trainers remain unpunished by CDI.  [*Id.* at 25].

On September 10, 2021, CDI instituted a new rule, which prohibits any horse trained by a person suspended from running at Churchill Downs from earning points to qualify for the Kentucky Derby or the Kentucky Oaks, even if those races were not held at CDI properties.  [*Id.*]. Baffert alleges that he is the only trainer affected by the new rule and that CDI created the rule with the "singular aim of destroying Baffert's career."  [*Id.* at 25–26].  He further alleges that CDI has caused significant damage to Baffert's ability to conduct his customary business on a national scale.  [*Id.* at 26].

Plaintiffs requested additional testing on Medina Spirit's biological samples in an effort to prove that the betamethasone detected was not the result of a prohibited injection.  [*Id.* at 28]. They hoped to prove, instead, that the betamethasone present in Medina Spirit bloodstream

following the 2021 Kentucky Derby was the result of a topical ointment applied before the race. [*Id.* at 26–28].

After Medina Spirit tested positive for betamethasone, Plaintiffs were provided with notice from the KHRC of the suspected violation and informed of their right to an evidentiary hearing before the stewards. [*Id.*]. In Kentucky, the "absolute insurer" or "trainer responsibility" rule places the responsibility for a positive test on the horse's trainer. [*Id.* at 29]. This is because it is difficult to determine the source of the medication and the circumstances surrounding its administration. [*Id.*]. Picklesimer, who Plaintiffs allege is a compensated by CDI as the racing director at Turfway Park, sat as the third steward at the Stewards hearing. [*Id.* at 28]. The Stewards hearing occurred on February 14, 2022. [*Id.* at 29]. The stewards recommended a 90-day suspension and disqualified Medina Spirit as the winner of the 2021 Kentucky Derby. [*Id.*]. The KHRC denied Plaintiffs' request for a stay of the suspension. [*Id.* at 29–30]. Plaintiffs' attempts to stay the suspension in Kentucky State Court were unsuccessful.[1] [DE 33-3; DE 33-4; DE 33-5]. The KHRC's adjudication of the 90-day suspension remains ongoing. [DE 41 at 1371].

On February 28, 2022, Plaintiffs filed this action in the Western District of Kentucky. [DE 1]. The Complaint articulates eight causes of action: Count 1 violation of 42 U.S.C. § 1983 against CDI and Carstanjen and Rankin in their individual capacities, Count 2 unlawful exclusion against CDI, Counts 3 unlawful conspiracy in restraint of trade pursuant to 15 U.S.C. §§ 1, 15, and 26 against Defendants, Count 4 unlawful use of monopoly power pursuant to 15 U.S.C. §§ 2, 15, and 26 against Defendants, Count 5 tortious interference with contractual relations against CDI and Carstanjen, Count 6 tortious interference with prospective business relations against CDI and

---

[1] Plaintiffs withdrew their first request for a preliminary injunction once they exhausted their attempts to stay the KHRC's 90-day suspension.

Carstanjen, Count 7 asks for a declaratory judgment against Defendants, and Count 8 asks for a preliminary and permanent injunction. [*Id.*].

On March 1, 2022, Plaintiffs filed their first motion seeking injunctive relief from CDI's suspension. [DE 5]. Plaintiffs also moved to expedite briefing in an effort to secure a preliminary injunction before the 2022 Kentucky Oaks and Kentucky Derby. [DE 6]. The Court promptly scheduled an evidentiary hearing for April 15, 2022. [DE 32]. On April 4, 2022, Plaintiffs moved to withdraw their motion for a preliminary injunction. [DE 33]. Plaintiffs explained that the stewards had imposed a 90-day suspension independent of CDI's that would begin on April 4. [*Id.* at 1125]. Plaintiffs sought judicial relief in Franklin County Circuit Court and the Kentucky Court of Appeals. [*Id.*]. However, neither court would stay the KHRC's suspension. [*Id.*]. Because Plaintiffs would have to resolve the KHRC's suspension independently from CDI's suspension to race in the 2022 Kentucky Oaks and Kentucky Derby, Plaintiffs decided to withdraw their first motion without prejudice. [*Id.*]. The KHRC's suspension expired on July 2, 2022. [*Id.*].

On December 15, 2022, Plaintiffs renewed their motion for a preliminary injunction. [DE 41]. The Court held an evidentiary hearing on February 2 and 3, 2023 regarding Plaintiffs' Renewed Motion for a Preliminary Injunction. [DE 65]; Feb. 2–3, 2023, Hrg. Tr., 1:1–2. During the hearing, the parties spent a great deal of time discussing the merits of claims before the KHRC, which are not at issue here. After the hearing, Plaintiffs filed an "Advice to the Court" explaining new guidance from the Racing Medication and Testing Consortium related to screening for betamethasone. [DE 64]. The Court understands the Plaintiffs' desire to cite this new guidance and the Court has reviewed it, but as the Court instructed at the beginning of the hearing on February 3, whether Plaintiffs violated the KHRC rules and regulations is irrelevant. *See* Feb. 2–3, 2023, Hrg. Tr., 138:21–139:19. The Court will only examine whether Defendants acted within

their rights to suspend Plaintiffs pursuant to federal and state law or any contracts between the parties. Therefore, the Court will not decide whether Plaintiffs violated KHRC rules and regulations by treating Medina Spirit with betamethasone because this issue is not before the Court.

## II.    DEFENDANTS' MOTION TO DISMISS [DE 36]

First, Defendants argue that Plaintiffs' § 1983 claim fails because CDI is not a state actor. [DE 36 at 1197]. Plaintiffs contend that they have asserted a claim under several theories. [DE 39 at 1246–47]. Next, Defendants argue that the unlawful exclusion claim must fail as a matter of law. [DE 36 at 1197]. In response, Plaintiffs argue Defendants forfeited their rights of exclusion or never had them at all. [DE 39 at 1259]. Third, Defendants contend that the antitrust claims fail because Plaintiffs have not alleged an antitrust injury. [DE 36 at 1197–98]. Plaintiffs assert that Defendants ignore the allegations in the Complaint. [DE 39 at 1263]. Finally, Defendants allege that Plaintiffs' tortious interference claims must fail because they exercised rights pursuant to contract. [DE 36 at 1198]. Plaintiffs contend that Defendants' contract defense is premature. [DE 39 at 1272].

### A.   Standard

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). As stated, when considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *See Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M & G Polymers, USA, LLC*,

561 F.3d 478, 488 (6th Cir. 2009) (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

### B.  Analysis

#### i.  *Count 1: Violations of § 1983*

Defendants argue that Plaintiffs' § 1983 claim fails because CDI is not a state actor.  [DE 36 at 1197].  Plaintiffs contend that they have asserted a claim under several theories.  [DE 39 at 1246–47].

The actions of a private party may constitute state action under § 1983 when those actions may be "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982).  "The Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (citing *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992)).  To succeed on a claim asserting state action by a private entity, the plaintiff must satisfy one of these three tests. *See United States v.*

*Miller*, 982 F.3d 412, 423 (6th Cir. 2020).  Plaintiffs assert that CDI is a state actor under multiple theories.  [DE 1].  Therefore, the Court will examine whether Plaintiffs have asserted a claim under each of these three theories.

### a.   Public Function Test

A private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974).  The public function test requires the private entity to do more than exercise a function that a government entity exercised in the past or present.  *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019).  "Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." *Id.* (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)).

The Supreme Court has repeatedly held that "very few" functions rise to the level of state action.  *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978).  Functions that do meet the rigorous standards of the public function test include running elections, see *Terry v. Adams*, 345 U.S. 461, 468–470 (1953), and operating a company town, see *Marsh v. State of Ala.*, 326 U.S. 501, 505–509 (1946).  The Supreme Court has held that a variety of functions fail the public function test, including "running sports associations and leagues, administering insurance payments, operating nursing homes, providing special education, representing indigent criminal defendants, resolving private disputes, and supplying electricity." *Halleck*, 139 S. Ct. 1929.

Here, Plaintiffs articulate two public functions: (1) regulation of horse racing and (2) excluding Baffert from a municipal park.  [DE 39 at 1253].  First, the Supreme Court of Kentucky has held that "thoroughbred horse racing is not, in Kentucky at any rate, a government function." *Jamgotchian v. Kentucky Horse Racing Comm'n*, 488 S.W.3d 594, 608 (Ky. 2016).  Plaintiffs cite *Jamgotchian* for the proposition that horse racing is regulated by the state, not private entities.

8

[DE 39 at 1252].  However, this citation related to the Supreme Court of Kentucky's Commerce Clause analysis.  *See Jamgotchian*, 488 S.W.3d at 616.  Before analyzing claims under the Commerce Clause, the Kentucky Supreme Court held that "Kentucky's regulation of thoroughbred horse racing, as extensive and as longstanding as that regulation may be, is not by itself sufficient to bring this case within the 'traditional government function' rule."  *Id.* at 610.  Accordingly, Plaintiffs' assertion that the regulation of horse racing must fail as a matter of law.  *See id.*

Plaintiffs also assert that CDI was exercising a public function by excluding Baffert from a municipal park.  [DE 39 at 1253].  Plaintiffs' argument that Churchill Downs Racetrack is a municipal park seems to be based on the fact the CDI leases the property from the City of Louisville.  [DE 1 at 10].  At no point in the Complaint do Plaintiffs describe Churchill Downs Racetrack as a "municipal park."  [*Id.*].  Plaintiffs also failed to cite a case holding that land leased from the government by a private entity creates a municipal park.  [DE 39 at 1253].  Even still, the Supreme Court has not articulated a rule so broad that any operation of a public park by a private entity rises to the level of a public function.  *See Flagg Bros.*, 436 U.S. at 159 n. 8.  Based on the foregoing, Plaintiffs have failed to state facts sufficient to assert a claim that is "plausible on its face" under the public function test.  *Twombly*, 550 U.S. at 570.

b.  State Compulsion Test

A private entity's conduct may qualify as government action if the government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" government.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  For example, the Supreme Court has held that federal regulations requiring private railroads to conduct post-accident drug and alcohol testing on employees constituted compulsion that converted the actions of a private entity into those of a state actor.  *See, e.g.*, *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989).  The Supreme Court has also held

that regulations merely permitting private entities to conduct this type of testing in limited circumstances qualified as state action. *See id.* at 611–12, 615. However, this holding was based on multiple, fact-specific features of the regulations. *See id.* Nevertheless, "private action does not become government action merely because the government authorizes or acquiesces in it." *Miller*, 982 F.3d at 424 (citing *Flagg Bros.*, 436 U.S. at 164–65). Even extensive regulation of a private entity will not convert its actions into state actions. *See id.*

Plaintiffs allege that horse racing in Kentucky is highly regulated and controlled by the state. [DE 1 at 31–32]. The Complaint further alleges that races are managed, supervised, and controlled by the KHRC's deputized officials. [*Id.* at 32]. CDI and the KCRA "cooperate in policing medication violations. [*Id.* at 33]. However, Plaintiffs concede that CDI's suspension is more severe and independent of the KHRC's suspension. [*Id.*]. Although races conducted by CDI are heavily regulated by the KHRC, this is not a basis on its own for state action. *See Miller*, 982 F.3d at 424. In *Heflin v. Kentucky State Racing Comm'n*, 701 F.2d 599 (6th Cir. 1983), the Sixth Circuit determined that CDI was not a state actor when it denied stall space to a horse trainer. Like Plaintiffs' case, the Sixth Circuit found that denying stall space was not state action even though assigning stall space was a heavily regulated by the KHRC. *See id.* at 600. "The fact that state regulation may be pervasive does not alone transform a private corporation's actions into state action under Section 1983." *Id.* (citing *Jackson*, 419 U.S. at 350). Accordingly, Plaintiffs have failed to state facts sufficient to assert a claim that is "plausible on its face" under the compulsion test. *Twombly*, 550 U.S. at 570.

c.   Nexus Test

A private entity's conduct may qualify as government action if "a sufficiently close nexus" exists between a private party and government actors. *Jackson*, 419 U.S. at 351. The Sixth Circuit has held that legal traditions can shed light on the required "nexus." *See Miller*, 982 F.3d at 425.

10

For example, "private action could be treated as government action if private and public actors conspired to violate constitutional rights." *See id.* (citing *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 512–13 (6th Cir. 2020)). The Sixth Circuit has also compared the nexus test to an agency relationship. *See id.* (quoting Restatement (Second) of Agency § 1 (Am. Law Inst. 1958) ("[T]he manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.")). "A plaintiff must show more than joint activity with the state to prove that a private party working for the government is a state actor. In particular, she must demonstrate 'pervasive entwinement' between the two entities." *Partin v. Davis*, 675 F. App'x 575, 586–87 (6th Cir. 2017) (citing *McCarthy v. Middle Tennessee Elec. Membership Corp.*, 466 F.3d 399, 412 (6th Cir. 2006)). "The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis." *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003) (*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)).

Here, Plaintiffs have alleged various mechanisms of "pervasive entwinement" between CDI and the state. *Partin*, 675 F. App'x at 586–87. Specifically, Plaintiffs allege that the KHRC manages, supervises, and controls races conducted by CDI. [DE 1 at 32]. Racing officials assist the stewards in a variety of roles that affect day-to-day horse racing: assistant racing secretary, a clerk of scales, paddock judges, starters, a placing judge, timers, identifiers, veterinarians, assistant starters, jockey room custodians, jockey room employees, valets, and outriders. [*Id.* at 15]. The racing officials are ultimately subject to the supervision of the stewards. [*Id.* at 32]. One steward, Picklesimer, is also an employee at CDI. [*Id.* at 33]. Picklesimer reviewed evidence and concluded that Medina Spirit tested positive for betamethasone in violation of the KHRC's rules and regulations. [*Id.*]. CDI did not conduct an independent investigation but relied on the findings of the KHRC. [*Id.*].

Whether CDI was a state actor when it imposed its suspension on Plaintiffs is a fact-intensive inquiry that must be analyzed on a case-by-case basis. *Chapman*, 319 F.3d at 834. Moreover, at this stage of the litigation the Court must presume all factual allegations in the Complaint to be true and make all reasonable inferences in favor of Plaintiffs. *See Total Benefits Planning Agency, Inc.*, 552 F.3d at 434. At this stage, Plaintiffs have alleged facts sufficient to show that CDI was pervasively entwined with the state for purposes of a motion to dismiss. *See Partin*, 675 F. App'x at 586–87. Plaintiffs have also alleged facts sufficient to show that CDI could have acted in agency with the KHRC regarding CDI's suspension. *See Miller*, 982 F.3d at 425. Making all reasonable inferences in Plaintiffs' favor, see *Twombly*, 550 U.S. at 570, the Court must find "a sufficiently close nexus" exists between Defendants and the state for purposes of Plaintiffs' suspension. *Jackson*, 419 U.S. at 351.

### d.  Due Process Rights

Assuming Plaintiffs can prove that the suspension constitutes state action on behalf of Defendants, Plaintiffs must still prove that Defendants violated the Due Process Clause. *See West v. Kentucky Horse Racing Comm'n*, 972 F.3d 881, 890 (6th Cir. 2020). Defendants contend that Baffert's rights were not violated because he was never deprived of his trainer's license and because Plaintiffs' relationship with CDI was governed by contract. [DE 36 at 1208]. In response, Plaintiffs contend that the suspension expressly infringes on their protected liberty interests. [DE 39 at 1257–59]. To plead a due process claim, a party must allege: "(1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process." *West*, 972 F.3d at 890 (quoting *Fields v. Henry Cnty., Tenn.*, 701 F.3d 180, 185 (6th Cir. 2012)).

Baffert alleges that he has a protected liberty and property interest in plying his trade at the Churchill Downs Racetrack and in his trainer's license. [DE 39 at 1258]. While a person cannot

be banned from a public park, see *Kennedy v. City of Cincinnati*, 595 F.3d 327, 336 (6th Cir. 2010), Plaintiffs have not alleged facts sufficient to claim that Churchill Downs Racetrack is a public park. In *Kennedy*, which was cited by the Plaintiffs, a party was banned from visiting a public pool that was operated by the Cincinnati Recreation Commission. *See id.* at 330. Plaintiffs have failed to allege facts to suggest that Churchill Downs Racetrack is similar to a public pool operated by the city. *See id.* With respect to Baffert's trainer's license, Defendants assume that Baffert has a property interest in the license. [DE 36 at 1208]. Moreover, the Supreme Court has held that similar licenses create a property interest "sufficient to invoke the protection of the Due Process Clause." *Barry v. Barchi*, 443 U.S. 55, 64 (1979). Accordingly, Baffert's trainer's license creates a property interest that satisfies the first element of a due process claim. *See id.*

Next, Defendants argue that they did not deprive Baffert of his license but merely suspended him from entering races at CDI racetracks. [DE 36 at 1208]. "[C]ourts have typically recognized indirect injuries to the value of property as constitutional 'deprivations' only 'when such indirect injuries *effectively render the property valueless.*'" *Med Corp. v. City of Lima*, 296 F.3d 404, 413 (6th Cir. 2002) (quoting *Wells Fargo Armored Serv. Corp. v. Georgia Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977)). Baffert alleges that CDI's suspension "has rendered valueless Baffert's training services at a national level." [DE 1 at 26]. Although the parties may dispute the value of Baffert's license after CDI's suspension, those fact-based questions are not appropriate for a motion to dismiss. *See Total Benefits Plan. Agency, Inc.*, 552 F.3d at 434 (requiring the Court to accept all factual allegations in the complaint as true). Therefore, Plaintiffs have successfully alleged the deprivation of a property interest in Baffert's trainer's license. *See West*, 972 F.3d at 890.

13

Finally, Defendants contend that Plaintiffs' relationship with CDI is governed by contract, which provides all the process that is due. [DE 36 at 1208]. Because Plaintiffs have alleged facts to support the first the elements of a due process violation, a "prompt postsuspension hearing" was required. *See Barry*, 443 U.S. at 66. Defendants have not asserted that Plaintiffs were given a hearing prior to CDI's suspension. [DE 36]. Moreover, Defendants' contract defense need not be considered for the purposes of their motion to dismiss. *See Memphis, Tennessee Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 904 (6th Cir. 2004) ("A complaint need not anticipate every defense and accordingly need not plead every response to a potential defense.").

Based on the foregoing, Plaintiffs have alleged facts sufficient to state a claim for a violation of Baffert's due process rights only as they relate to his trainer's license. *See West*, 972 F.3d at 890. Therefore, Defendants' Motion to Dismiss [DE 36] Plaintiffs' § 1983 claim is **DENIED**.[2]

### ii. Count II: Unlawful Exclusion

Defendants argue that the unlawful exclusion claim must fail as a matter of law. [DE 36 at 1197]. In response, Plaintiffs argue Defendants forfeited their rights of exclusion or never had them at all. [DE 39 at 1259].

The Kentucky Supreme Court has never recognized the tort of unlawful exclusion. When the state court has refused to recognize a cause of action, this Court must also "decline to do so as well." *Hardy v. Jefferson Cmty. Coll.*, No. CIV.A.3:99CV-477-S, 2000 WL 34249107, at *1 (W.D. Ky. Feb. 9, 2000); *see also Daugherty v. Louisville-Jefferson Cnty. Metro Gov't*, 495 F.

---

[2] Plaintiffs are only required to allege facts that are plausible on their face to survive a motion to dismiss. *See Twombly*, 550 U.S. at 570. However, as discussed in Section III.B.ii.a., Plaintiffs are unable to meet their higher burden to show a likelihood of success on the merits of their § 1983 claim. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Supp. 3d 513, 527 (W.D. Ky. 2020) ("[B]ecause Kentucky law does not recognize such a cause of action, the district court did nor err in dismissing [plaintiff's] claim." (quoting *Crosby v. Univ. of Kentucky*, 863 F.3d 545, 558 (6th Cir. 2017))).

Plaintiffs assert their claim for unlawful exclusion against CDI under the "Common Law." [DE 1 at 35].  To avoid dismissal, Plaintiffs argue that Defendants forfeited their right to exclude when CDI dedicated the Churchill Downs Racetrack and facilities for public use in 2002.  [DE 39 at 1259].  "A dedication is the 'appropriation of land, . . . by the owner, for the use of the public, and accepted for such use by or on behalf of the public.'"  *Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 938 (6th Cir. 1997) (quoting Black's Law Dictionary 412 (6th ed. 1990)).  The property owner may dedicate land for public use by an explicit oral or written declaration dedicating the land to public use.  *See id.*  "The key to a dedication is the intent of the dedicator[.]"  *Id.*  If the dedicator "retain[s] possession of the property, they hold it as trustees for the public."  *Brewer v. City of Mayfield*, 231 Ky. 356 (1929).  Therefore, a property dedication "deprive[s] [the dedicator] of the right to exclude others." *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (citation omitted).

Plaintiffs contend that CDI dedicated the Churchill Downs Racetrack via its lease.[3]  [DE 39 at 1260].  According to the lease agreement between CDI and the City of Louisville, the Churchill Downs Racetrack "as proposed by [CDI] will be utilized to make horseracing, entertainment, dining, pari-mutuel wagering and other recreational activities available to the

---

[3] Rule 12(d) of the Federal Rules of Civil Procedure provides that, if "matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  The Court, however, "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein" without converting to a summary judgment.  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).  The lease is quoted from and referenced in the Complaint and is central to these claims.  [*See* DE 1 at 9–10].  Furthermore, neither party disputes that the lease is properly considered by the Court here.  Thus, the Court may properly consider it without converting the motion to dismiss to a motion for summary judgment.

public[.]" [DE 39-1 at 1281].  Contrary to Plaintiffs' contentions, this language severely falls short of a "devotion to a public use by an unequivocal act of the owner." *Bush & Burchett, Inc.*, 117 F.3d at 938 (quoting Black's Law Dictionary 412).  CDI asserts that it has made no such dedication [DE 40 at 1352], and Plaintiffs have failed to allege any additional facts in the Complaint that would suggest CDI dedicated the Churchill Downs Racetrack for the public use [DE 1 at 9].  The Court will not recognize a cause of action that has not been endorsed by the state court, see *Hardy*, 2000 WL 34249107, at *1, and Plaintiffs have not asserted a legal basis to suggest that CDI cannot exclude others from its premises.  *See Dolan*, 512 U.S. at 384.  Therefore, Plaintiff's claim must be dismissed because it is not supported by law.  *See Southfield Educ. Ass'n*, 570 F. App'x at 487.

Plaintiffs also assert that Baffert has been unlawfully excluded from CDI's Louisiana racetracks and "remaining racetracks."  [DE 39 at 1261].  Louisiana law provides the following:

> If a person is excluded from or ejected from any race track, race meeting, race, or any establishment licensed to operate or conduct any exotic wagering or pari-mutuel wagering or pools by a majority of the stewards of a race track, association or establishment, the person shall exhaust all administrative remedies before the commission prior to instituting any legal action seeking judicial relief.

La. Stat. Ann. § 4:191(A).  Plaintiffs cite *Wolf v. Louisiana State Racing Comm'n*, 545 So. 2d 976 (La. 1989), which held that "the unilateral exclusion of a permittee by [a racetrack] is inconsistent with the procedures established by the legislature[.]"  However, racetracks in Louisiana are allowed to exclude trainers pursuant to the procedures set forth under state law.  *See* La. Stat. Ann. § 4:191-93; *Churchill Downs La. Horseracing Co. v. Louisiana State Racing Comm'n*, No. 2021-09587 (La. Dist. Ct. Oct. 17, 2022) (A racetrack "has the legal right to exclude licensees or permittees for the reasons, and pursuant to the procedures afforded La. Stat. Ann. § 4:191-93 and Title 35 of the Louisiana Administrative Code, Pt I § 1801, and other applicable law.").  The remedy for exclusion is to follow the procedures prescribed by law, which includes first exhausting all administrative remedies.  *See* La. Stat. Ann. § 4:191.  Plaintiffs have not pled any facts

suggesting that they have initiated or exhausted administrative remedies in Louisiana. [DE 1]. Accordingly, Plaintiffs fail to state a claim under Louisiana law. *See Twombly*, 550 U.S. at 570.

As for CDI's remaining racetracks, Plaintiffs' Complaint does not provide any additional details regarding these tracks or the applicable law. [DE 1]. The Sixth Circuit has held that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284 (1st Cir. 1995)). Without additional facts, the Court is unable to evaluate the merits or jurisdictional issues related to any claim that may have been asserted.

Based on the analysis above, Plaintiffs have failed to assert a claim against CDI for unlawful exclusion under the common law. Defendants' Motion to Dismiss [DE 36] Plaintiffs' unlawful exclusion claims is **GRANTED**.

### iii.   Counts III–IV: Antitrust Claims

Defendants contend that the antitrust claims fail because Plaintiffs have not alleged an antitrust injury or standing. [DE 36 at 1197–98]. Plaintiffs assert that Defendants ignore the allegations in the Complaint. [DE 39 at 1263].

The Sherman Act renders illegal every contract, combination, or conspiracy that restrains trade. 15 U.S.C. § 1. To establish an antitrust injury, "it is not enough for the plaintiff to claim economic injury: 'Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Valley Prod. Co. v. Landmark, a Div. of Hosp. Franchise Sys., Inc.*, 128 F.3d 398, 402 (6th Cir. 1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Injunctive relief under § 16 of the Clayton Act, *see* 15 U.S.C. § 16, likewise requires an

17

antitrust injury. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986).  "[A]ntitrust laws . . . were enacted for 'the protection of competition not competitors[.]'" *Brunswick Corp.*, 429 U.S. at 489 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  Therefore, Plaintiffs cannot prevail in law or equity without first asserting an antitrust injury.  *See id.*

One of the factors the Court must consider is the "directness or indirectness of the asserted injury." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 541 (1983).  "[T]he antitrust injury doctrine depends less on the plaintiff's proof than on the logic of its complaint and its theory of injury.  Theories that do not depend on proof are well suited to pre-discovery disposition."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 337d (2022).  "The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation."  *Valley Products Co.*, 128 F.3d at 403.

Plaintiffs, by their own admission, allege injuries to themselves resulting from CDI's suspension.[4]  [DE 39 at 1264].  A horse's performance at the racetrack determines its value as breeding stock.  [*Id.*].  Therefore, owners employ trainers to condition their horses and increase the horse's value.  [*Id.*].  In addition to Baffert's own injury, Plaintiffs' theory of injury is that "Defendants and their co-conspirators have . . . deprive[d] owners of their freedom to select their chosen trainer for their Derby horses while leaving the licenses of their own trainers unencumbered."  [DE 39 at 1265].  However, "removal of one competitor typically does not

---

[4] "As the party directly named in CDI's 'suspension,' Baffert is the most direct victim of Defendants' anti-competitive behavior, and he is uniquely situated to enforce an antitrust action against Defendants."  [DE 1 at 45].

constitute injury to competition[.]" *Vangala v. St. Mary's Reg'l Med. Ctr.*, 31 F. App'x 537, 538 (9th Cir. 2002). Baffert's suspension only harms Plaintiffs, who are competitors, not competition in a cognizable market. *See Brunswick Corp.*, 429 U.S. at 489. Therefore, neither theory articulates an "injury of the type the antitrust laws were intended to prevent." *Valley Products Co.*, 128 F.3d at 402.

To the extent Plaintiffs allege antitrust claims on behalf of horse owners,[5] these claims suffer additional deficiencies. "[O]nly claimants who are competitors or consumers within the injured market have standing to sue." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 404 (6th Cir. 2012), *aff'd,* 572 U.S. 118 (2014). Plaintiffs are not competitors or consumers that would be similarly situated to horse owners, but they may allege standing if their injury is "'inextricably intertwined' with the injury sought to be inflicted upon the relevant market or participants therein." *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1086 (6th Cir. 1983). The Sixth Circuit has held that this exception is narrow. *See Static Control Components, Inc.*, 697 F.3d at 404. Plaintiffs must show that Defendants "manipulated or utilized [Plaintiffs] as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets." However, Plaintiffs have not alleged that Defendants manipulated them to injure horse owners. *See id.* Therefore, Plaintiffs cannot succeed under the narrow "inextricably intertwined" exception to standing. *See Static Control Components, Inc.*, 697 F.3d at 404. Moreover, the Sixth Circuit has held that "more-direct victims of the anticompetitive conduct," the horse owners, "have the standing to sue, rather than those affected indirectly." *See id.* at 405.

---

[5] The Court notes that this argument was not explicitly articulated in the Complaint. Defendants are entitled to "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Even accepting the allegations in Plaintiffs' Complaint as true, see *Total Benefits Planning Agency, Inc.*, 552 F.3d at 434, Plaintiffs have failed to demonstrate any "decrease in competition." *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994). Because Defendants' "alleged actions do not affect economic competition in interstate thoroughbred racing," Plaintiffs have failed to allege an antitrust injury. *See Catrone v. Ogden Suffolk Downs, Inc.*, 683 F. Supp. 302, 307 (D. Mass. 1988). Therefore, Plaintiffs have failed to state a claim for either of the alleged antitrust claims. *See Twombly*, 550 U.S. at 570. The Court will not address additional arguments asserted by the parties in their briefs because Plaintiffs do not have standing to assert antitrust claims as alleged. Defendants' Motion to Dismiss [DE 36] Plaintiffs' antitrust claims is **GRANTED**.

### iv.   *Counts V–VI: Tortious Interference Claims*

Defendants allege that Plaintiffs' tortious interference claims must fail because they exercised rights pursuant to contract. [DE 36 at 1198]. Plaintiff contends that Defendants' contract defense is premature. [DE 39 at 1272].

Before the Court can determine whether Plaintiffs have stated a claim, it must first determine whether the Rules and Conditions for Racing and Training that Baffert signed as a condition to enter horses in the 2021 Kentucky Derby may be considered at this stage in the proceedings. The Sixth Circuit takes "a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)." *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001). Courts may consider documents referred to in the Complaint and central to the claims even if it was not attached to the Complaint. *Williams v. Porter Bancorp, Inc.*, 41 F. Supp. 3d 676, 680 (W.D. Ky. 2014).

Here, Plaintiffs' Complaint specifically mentions the Rules and Conditions for Racing and Training when it recounts CDI's press release: "This decision follows the confirmation by attorneys representing Bob Baffert of the presence of betamethasone, . . . in violation of the

Commonwealth of Kentucky's equine medication protocols and *CDI's terms and conditions for racing*." [DE 1 at 24 (emphasis added)].  Plaintiffs also concede that "Baffert expressly agreed to cooperate with the Racing Commission's regulatory process when the entered horses at Churchill Downs[.]" [*Id.* at 3].  That regulatory process is explicitly incorporated in the Rules and Conditions for Racing and Training.  [DE 36 at 1198].  Finally, Plaintiffs note that "CDI's actions are purportedly premised on a violation of the Rules of Racing regarding medication protocols." [*Id.* at 38].  The Court also notes that Plaintiffs filed the Rules and Conditions for Racing and Training as an exhibit prior to Defendants' Motion to Dismiss.  [DE 5-16].  Because of the Sixth Circuit's liberal view of what may be considered on a motion to dismiss, see *Armengau*, 7 F. App'x at 344, the Court finds that the Rules and Conditions for Racing and Training may be considered for Defendants' Motion to Dismiss.

Under Kentucky law, a claim for tortious interference with contract requires: "(1) the existence of a contract; (2) knowledge of this contract; (3) intent to cause a breach; (4) conduct that caused the breach or prevented the contract from coming into being; (5) damages; and (6) lack of privilege or justification to excuse the conduct." *Griffin v. Jones*, 170 F. Supp. 3d 956, 967 (W.D. Ky. 2016) (citing *Marcus & Millichap Real Est. Inv. Brokerage Co. v. Skeeters*, 395 F. Supp. 2d 541, 552–53 (W.D. Ky. 2005)).  A claim for tortious interference with prospective business relations requires: "(1) the existence of a valid business relationship or its expectancy; (2) defendant's knowledge thereof, (3) an intentional act of interference; (4) an improper motive; (5) causation; and (6) special damages." *Id.*  In either case, "Kentucky courts and federal courts alike have recognized that the exercise of legitimate contract rights cannot give rise to an intentional interference claim." *Raheel Foods, LLC v. Yum! Brands, Inc.*, No. 3:16-CV-00451-GNS, 2017 WL 217751, at *4 (W.D. Ky. Jan. 18, 2017).

Plaintiffs allege that Defendants knew Baffert had contracts to train horses and knew that Baffert had business relationships that were contingent on his ability to train horses for the Kentucky Derby. [DE 1 at 49–53]. Plaintiffs further allege that Baffert's suspension was instituted "intentionally and with malice." [*Id.* at 51]. Because of Baffert's suspension, horse owners cancelled training agreements with Plaintiffs, which resulted in monetary damages. [*Id.*]. Plaintiffs allege that Baffert's suspension also caused him to suffer losses that would have resulted if he had not been deprived of the opportunity to train horses for the Kentucky Derby. [*Id.* at 53]. Defendants contend that Plaintiffs' tortious interference claims must fail because Baffert's suspension was levied pursuant to a contract between the parties. [DE 36 at 1198]. CDI suspended Plaintiffs for violating Kentucky's equine medical protocols and CDI's terms and conditions for racing. [DE 1 at 24]. Plaintiffs' tortious interference claims cannot succeed because CDI exercised legitimate contract rights. *Raheel Foods, LLC*, 2017 WL 217751, at *4.

The Supreme Court of Kentucky demonstrated the application of this defense in *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988). In *Hornung*, a television network had a contract with the NCAA to air college sporting events. *See id.* at 856. The contract allowed the NCAA to approve or deny announcers selected by the network. *See id.* The network submitted an announcer's name, but the NCAA did not approve. *See id.* at 856–87. The announcer sued the NCAA for intentional interference with prospective economic advantage. *See id.* at 855. The Kentucky Supreme Court held that the NCAA was entitled not to approve the announcer pursuant to its contract with the network even if it damaged the announcer's prospective contractual relationship with the network. *See id.* at 859–60.

The situation surrounding CDI, Plaintiffs, and horse owners seeking Baffert's services is similar to *Hornung*. *See id.* Baffert violated the terms of the Rules and Conditions for Racing and Training, which prompted CDI's suspension. [DE 1 at 24]. CDI was within its rights to suspend Baffert even if doing so harmed ongoing or prospective business relationships between Baffert and horse owners seeking his services. *See Hornung*, 754 S.W.2d at 859–60. Ultimately, Plaintiffs have failed to allege facts sufficient to assert a plausible claim. *See Twombly*, 550 U.S. at 570. Because Plaintiffs' claims have failed under the analysis above, the Court will not consider additional arguments articulated by the Defendants. Therefore, Defendants' Motion to Dismiss [DE 36] Plaintiffs' tortious interference claims is **GRANTED**.

## III. PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION [DE 41]

Plaintiffs renewed their Motion for a preliminary injunction on December 15, 2022. [DE 41]. The Court held an approximately 7-hour hearing over two days where the parties presented their arguments and put on evidence. [DE 65]. The Court heard testimony from William Farmer, Baffert, and Michael Anderson. [*Id.* at 4543]. Plaintiffs moved for a preliminary injunction based on their § 1983, unlawful exclusion, and antitrust claims (Counts 1–4). [DE 41]. Because Counts 2–6 have been dismissed, the Court will limit its analysis to Count 1. *See also* Feb. 2–3, Hrg. Tr., 1394–19.

### A. Standard

A preliminary injunction "should be granted only if the movant carries his or her burden." *Overstreet*, 305 F.3d at 573. However, the moving party "is not required to prove his case in full at a preliminary injunction hearing." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In the Sixth Circuit,

> [f]our factors guide the decision to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant

would suffer irreparable injury absent the injunction; (3) whether the injunction
would cause substantial harm to others; and (4) whether the public interest would
be served by the issuance of an injunction."

*S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir.

2017) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)).  "[T]hese are

factors to be balanced, not prerequisites to be met." *Id.* (citing *Certified Restoration Dry Cleaning*

*Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).  "For example, 'a finding that

the movant has not established a strong probability of success on the merits will not preclude a

court from exercising its discretion to issue a preliminary injunction if the movant has, at

minimum, shown serious questions going to the merits and irreparable harm which decidedly

outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding*

*Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399–400 (6th Cir. 1997) (internal quotations and

brackets omitted).

### B. Analysis

#### i.   *Plaintiffs' Irreparable Injury Absent an Injunction*

The first factor that the Court must balance is whether Plaintiffs would suffer irreparable

injury absent an injunction.  *See Great Lakes Brewing Co.*, 860 F.3d at 849.  Plaintiffs have alleged

three irreparable injuries: (1) the loss of purses, (2) the loss of unique opportunities and customer

goodwill, and (3) the loss of the intangible value of competing for and winning in competitions at

the highest level of horseracing internationally.  [DE 41 at 1372–73].  The Court will examine each

of these alleged injuries below.

#### a.   Unreasonable Delay

Before the Court can evaluate Plaintiffs' alleged irreparable injures, the Court must first

address Plaintiffs' delay in seeking a preliminary injunction.  "[A]n unreasonable delay in filing

for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013). "[N]umerous courts have recognized that any presumption of irreparable injury resulting from a court's finding that the plaintiff can show a substantial likelihood of success on the merits is rebutted by a delay of even a few months in seeking preliminary injunctive relief." *Vita-Mix Corp. v. Tristar Prod., Inc.*, No. 1:07 CV 275, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (collecting cases); *see also Adkins v. Am. Standard, Inc.*, No. 7:03-CV-278-KKC, 2005 WL 2137740, at *6 (E.D. Ky. Sept. 2, 2005) (holding a delay of approximately 18 months after filing the complaint and 30 months after the harm weighed against injunctive relief); *Le Sportsac, Inc. v. Dockside Rsch., Inc.*, 478 F. Supp. 602, 604 (S.D.N.Y. 1979) (holding a 10-month delay did not warrant a preliminary injunction).

Here, Plaintiffs renewed their motion for a preliminary injunction approximately 10 months after filing the Complaint. [DE 1]. Plaintiffs explained that CDI's suspension began on May 9, 2021. [*Id.* at 22]. This means they waited approximately 19 months after the suspension to request injunctive relief from this Court. [*Id.*]. In their reply and at the February 2 hearing, the only excuse Plaintiffs could give for their delay was the pursuit of litigation in other jurisdictions. [DE 54 at 4405; Feb. 2–3, 2023, Hrg. Tr., 40:1–7 ("[W]e haven't been exactly just sitting on our hands over this period of time. . . . Mr. Baffert was embroiled in a litigation in multiple states across multiple racetracks. We've been busy is the point.")].

Plaintiffs have not cited a case from the Sixth Circuit indicating that pursuit of other litigation would forgive delay. At the hearing, Plaintiffs compared their delay to *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519 (W.D. Ky. May 9, 2019). Feb. 2–3, Hrg. Tr., 43:10–19. In *JTH Tax*, this Court held that an 11-month delay in seeking injunctive

relief was not unreasonable.  *See* 2019 WL 2062519, at *12–13.  Plaintiffs correctly noted that, like tax season in *JTH Tax*, the Kentucky Derby is a recurring event.  Feb. 2–3, Hrg. Tr., 43:10–19.  However, *JTH Tax* is distinguishable for two reasons.  First, *JTH Tax* involved claims under the Lanham Act.  *See* 2019 WL 2062519, at *12–13.  Having already found a likelihood of success on the merits, "a finding of irreparable injury ordinarily follows."  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991) (citation and internal quotation marks omitted).  Second, the plaintiff already had an injunction in the Eastern District of Virginia that they believed applied to their claims.  *See JTH Tax, Inc.*, 2019 WL 2062519, at *12–13.  The plaintiff did not realize there was a need for a separate injunction until later.  *See id.*

Plaintiffs waited more than just a few months before they sought injunctive relief.  *See Vita-Mix Corporation*, 2008 WL 11383504, at *9.  As discussed above their case is easily distinguishable from *JTH Tax, Inc.*, 2019 WL 2062519, at *12–13.  Their delay is more akin to *Adkins*, 2005 WL 2137740, at *6 and *Le Sportsac, Inc.*, 478 F. Supp. at 604 due to the similar lengths of delay.  Unlike *JTH Tax*, this is not an instance where irreparable harm is presumed.  *See* 2019 WL 2062519, at *12–13.  Accordingly, Plaintiffs' delay weighs against a finding of irreparable harm from the outset of the Court's analysis.  *See Allied Erecting & Dismantling Co.*, 511 F. App'x at 405.

a.  <u>The Loss of Purses</u>

Plaintiffs contend that the most obvious harm they will suffer is the loss of purses.  [DE 41 at 1372].  In response, Defendants contend that the loss of purse money is speculative and inappropriate for injunctive relief.  [DE 50 at 3192].

"To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'"  *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (quoting

*Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)).  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Tenke Corp.*, 511 F.3d at 550.  An injury where damages may be difficult to calculate may not be compensable by money damages.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)

Here, Plaintiffs allege that the amount of winnings they will lose due to CDI's suspension "is impossible to calculate." [DE 41 at 1372].  These winnings are impossible to calculate because they are entirely speculative and theoretical. *See Griepentrog*, 945 F.2d at 154.  Courts in the Sixth Circuit, and elsewhere, have held that "there is no certainty in horse racing. . . . No one is certain to win today simply because he won before.  A win yesterday doesn't promise another today or tomorrow." *Class Racing Stable, LLC v. Breeders' Cup Ltd.*, No. CV 5:16-200-KKC, 2017 WL 562175, at *2 (E.D. Ky. Feb. 10, 2017) (quoting *Funny Cide Ventures, LLC v. Miami Herald Pub. Co.*, 955 So. 2d 1241, 1247 (Fla. Dist. Ct. App. 2007)).  Plaintiffs ultimately concede this point when they note that the racing industry "depends on the unpredictability of racing results." [DE 41 at 1373].  Even if Plaintiffs could calculate their lost winnings with reasonable certainty, that amount would be "fully compensable by monetary damages" as opposed to injunctive relief. *Stansbury v. Hopkins Hardwoods, Inc.*, No. 4:15-CV-00016-JHM, 2015 WL 461477, at *3 (W.D. Ky. Feb. 3, 2015).  Accordingly, the Court finds that Plaintiffs' loss of purses is speculative and does not result in irreparable harm. *See Griepentrog*, 945 F.2d at 154.

b.  <u>The Loss of Unique Opportunities and Goodwill</u>

Plaintiffs argue that their loss of ability to run horses and loss of goodwill constitute irreparable harm. [DE 41 at 1372].  Defendants contend that Baffert continues to enter horses in races all over the world and has failed to demonstrate a loss of customer goodwill. [DE 50 at

27

3193]. A plaintiff may demonstrate irreparable harm "through the loss of customers, goodwill or business." *Hagan v. Vision Serv. Plan*, No. 05-72517, 2005 WL 3447882, at *10 (E.D. Mich. Dec. 15, 2005); *see also Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172, 1181 (D. Kan. 1988).

Here, although a horse's eligibility to run in the Kentucky Derby is a once in a lifetime opportunity, trainers may enter horses every year. CDI's suspension is only applicable to Plaintiffs. As trainers, Plaintiffs may enter horses in every Kentucky Derby after the suspension expires. [DE 1 at 23–24]. Plaintiffs cite four affidavits from horse owners and argue that the horses will be moved to other stables unless CDI's suspension is resolved. [DE 41 at 1373 (citing DE 42-62; DE 42-63; DE 42-64; DE 42-65)]. However, only one of these affidavits, by Amr Zedan ("Zedan"), states that the owner will transfer his horses to another stable to race in the 2023 Kentucky Derby if CDI's suspension remains in place. [DE 42-62 at 3138]. Even still, Baffert has given conflicting accounts of why two of Zedan's three horses would be moved to another stable. Baffert's affidavit states that all three of horses would be moved because of CDI's suspension. [DE 42-61 at 3133]. Baffert has, however, testified elsewhere that two of the horses would be taken from his care because of a suspension in New York. [DE 53-26 at 4004]. Therefore, the Court is left with uncontroverted testimony that CDI's suspension will jeopardize his care of a single horse leading up to the 2023 Kentucky Derby.

Plaintiffs cite *Great Lakes Brewing* to argue that Plaintiffs' loss of goodwill constitutes irreparable harm. [DE 41 at 1373]. In *Great Lakes Brewing*, a distributer was faced with the prospect of losing a unique product from a manufacturer that would jeopardize its relationship with multiple retailers. *See* 860 F.3d at 853. The distributor was able to put forth evidence to suggest that it would lose a significant percent of its business if it was no longer able to provide

the unique product.  *See id.*  The circumstances before the Court are distinguishable from *Great Lakes Brewing*.  Instead of losing a significant percentage of their business, see *id.*, Plaintiffs have only submitted uncontroverted evidence they may lose a single horse because of CDI's ban [DE 42-62].  Moreover, CDI's suspension is temporary and will expire in just a few months.  [DE 1 at 23–24].  There is no indication that the loss of product in *Great Lakes Brewing* was temporary.  *See* 860 F.3d at 853.  The Court acknowledges there may be some risk of losing goodwill by not being able to train Zedan's horse for the 2023 Kentucky Derby.  But the affidavits from horse owners all hold Baffert in high regard and indicate that they are satisfied with Plaintiffs' services.  [DE 42-62; DE 42-63; DE 42-64; DE 42-65].  There is no indication that owners would not continue to use Plaintiffs' services after the 2023 Kentucky Derby even if the Court did not enjoin CDI's ban.  Accordingly, any loss of goodwill due to a single horse is nominal and unlikely to justify such an extreme remedy as injunctive relief.  *See Overstreet*, 305 F.3d at 573.

c.   The Loss of Competing in Horseracing Internationally

Plaintiffs also argue that the loss of intangible value from competing in and winning races in at the highest level of horseracing internationally constitutes irreparable harm.  [DE 41 at 3173].  Defendants contend that Plaintiffs mischaracterize the case law and note that Plaintiffs are still free to compete in other races.  [DE 50 at 3193–94].  Plaintiffs are only suspended from racing at CDI tracks and continue to enter horses in races around the world.  [DE 53-40].  Plaintiffs cite *Reynolds v. Int'l Amateur Athletic Fed'n*, 505 U.S. 1301, 1302 (1992) to argue that prohibiting Baffert from entering the 2023 Kentucky Derby robs him of a once in a lifetime opportunity that cannot remedied with pecuniary damages.  [DE 41 at 1373].  Again, this comparison is flawed.  Although horses are only eligible for the Kentucky Derby once, Baffert may enter horses again after CDI's suspension ends.  [DE 1 at 23–24].  Therefore, Plaintiffs have not demonstrated

irreparable harm by losing their ability to compete in the 2023 Kentucky Derby.

After analyzing each of Plaintiffs' arguments under the applicable case law, Plaintiffs have failed to demonstrate irreparable harm.  Any nominal harm from the loss of goodwill by losing a single horse is severely outweighed by Plaintiffs' unreasonable, 19-month delay in seeking injunctive relief.  *See Allied Erecting and Dismantling Co.*, 511 F. App'x at 405.   Therefore, the absence of irreparable harm weighs against injunctive relief.

ii.   *Plaintiff's Likelihood of Success of the Merits of Their § 1983 Claim*

Although Plaintiffs' Renewed Motion for a Preliminary Injunction fails to demonstrate irreparable harm, the Court will analyze their likelihood of success on the merits of their only remaining claim.  Plaintiffs argue that they have demonstrated a strong likelihood of success on the merits of their § 1983 claim.  [DE 41 at 1373].  Defendants contend that Plaintiffs have failed to demonstrate any likelihood of success on this claim.  [DE 50 at 3194].

a.   <u>CDI as a State Actor Under the Nexus Test</u>

Plaintiffs argue that CDI's suspension is attributable to the state under a variety of theories. [DE 41 at 1372–74].  In response, Defendants contend that CDI's decision to suspend Baffert was not state action because it was not made jointly with state officials.  [DE 50 at 3197].  As explained above, a private entity's conduct may qualify as government action if "a sufficiently close nexus" exists between a private party and government actors.  *Jackson*, 419 U.S. at 351.  The Court reincorporates the standards and case law cited in Section II.B.c.

Before the Court analyzes Plaintiffs' allegations, the Court must address the applicable law.  At the hearing on February 2, Plaintiffs argued that the Court should follow the Fifth Circuit's guidance in *Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221 (5th Cir. 1984).  Feb. 2–3, Hrg. Tr., 52:24–53:4.  In *Roberts*, the Fifth Circuit held that a racing secretary under Louisiana law was a

state actor when receiving entries and assigning stall space.  *See* 742 F.32d at 227.  However, the Defendants argued that the Court should follow the Kentucky Supreme Court in *Jamgotchian* and the Sixth Circuit in *Heflin*.  Feb. 2–3, Hrg. Tr., 87:12–88:14.  In both cases, the courts held that racetracks were not state actors as a general matter.  *See Heflin*, 701 F.2d at 600; *Jamgotchian*, 488 S.W.3d at 609 ("Churchill Downs and the other licensed racing associations in the state are private enterprises.").  Defendants also contended that the Court should take guidance from *Bier v. Fleming*, 717 F.2d 308, 311 (6th Cir. 1983) where the Sixth Circuit held that a racetrack's exclusion of a trainer from a meet was not state action.  *See* Feb. 2–3, Hrg. Tr., 87:12–88:14.  After reviewing the case law, the Court must apply the Sixth Circuit's decisions in *Heflin* and *Bier*.  The Court also takes guidance from *Jamgotchian*, which also involved CDI and was decided in Kentucky.  *See* 488 S.W.3d at 609.  The Court gives *Roberts* little weight because it does not involve Kentucky law and was decided outside the Sixth Circuit.

Turning to the merits, Plaintiffs contend that CDI is a highly regulated entity that is entwined with the state at almost every level.  [DE 41 at 1374–83].  They first point to the fact that the KHRC has a statutory obligation to supervise and control horseraces under state law.  [*Id.* at 1375 (citing KRS §§ 230.215(2); 230.260(1))].  The racing secretary assigns stall space "after consultation with the stewards."  810 KAR 2:020 § 2(9).  Picklesimer, a CDI employee and steward, was charged with identifying any "undesirable persons, if any, among owners and trainers applying for stalls and provide the association with information pertaining to the undesirable persons."  810 KAR 2:040 § 5(7).  Based on these Kentucky regulations, Plaintiffs contend that CDI cannot exclude trainers from the stalls without the KHRC.  [DE 41 at 1376].  Plaintiffs also explain that the KHRC has "forceful control of horse racing" in Kentucky, KRS § 230.215(2), and that deputized racing officials perform many the administrative duties.  810 KAR 2:010–20.

Plaintiffs' arguments point out that CDI is a highly regulated entity subject to intense state oversight, particularly on race days.  However, the Sixth Circuit and Kentucky Supreme Court have held that CDI is not a state actor simply because it is subject to pervasive state regulation. *See Heflin*, 701 F.2d at 600 (citing *Jackson*, 419 U.S. at 350); *Jamgotchian*, 488 S.W.3d at 608. The suspension, which was the ultimate act here, likely cannot be considered state action under the facts.  Here, Michael Anderson, the President of CDI, testified that "CDI reached its decision to suspend Mr. Baffert independently, without consulting with the KHRC or any state official. The KHRC did not advise, recommend, or otherwise influence CDI's suspension of Mr. Baffert." [DE 51 at 3241]; *see also* Feb. 2–3, Hrg. Tr., 230:10–23.  Instead, this decision was made by a group of CDI executives who based their decision on Medina Spirit's positive test for betamethasone and Baffert's history of testing failures.  [DE 51 at 3239].  CDI's suspension was not based on the violation of a particular KHRC rule or regulation. *See* Feb. 2–3, Hrg. Tr., 230:10– 23.  Without evidence to the contrary, it is unlikely Plaintiffs could prove this was not a "private decision." *Bier*, 717 F.2d at 311.  Accordingly, Plaintiffs have not shown a likelihood that CDI's suspension was attributable to the state.[6] *See Overstreet*, 305 F.3d at 573.

b. Due Process Violation

Although the Court doubts Plaintiffs can prove CDI was a state actor, the Court will examine the likelihood of success on the merits of Plaintiffs' due process claim.  The Court reincorporates the standards and case law cited in Section II.B.i.d.  Unlike the motion to dismiss discussed above, the Court must consider evidence provided by the parties. *See United States v.*

---

[6] CDI's suspension and the KHRC's suspension were not similar.  CDI suspended Baffert for two years from all CDI tracks on June 2, 2021.  [DE 1 at 23–24].  The KHRC held a hearing on February 14, 2022, and recommended a 90-day suspension.  [*Id.* at 3].  The suspensions were imposed nine months apart and for drastically different periods of time.  Logically speaking, one would expect similar suspensions from both entities had CDI acted in conjunction with the KHRC.

*Owens*, 54 F.3d 271, 276–77 (6th Cir. 1995).   Accordingly, Plaintiffs must prove: "(1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process." *West*, 972 F.3d at 890 (quoting *Fields*, 701 F.3d at 185).

As the Court has held, Baffert's trainer's license creates a property interest that satisfies the first element. *See Barry*, 443 U.S. at 66.   However, it is unlikely that Baffert can prove the injury has rendered his license valueless. *See Med Corp.*, 296 F.3d at 413.   Baffert has used his license to race multiple times at Keeneland, a non-CDI track in Kentucky, while his suspension has been in place.  [DE 53-42].   During this time, Baffert has earned over $1 million in prizes at Keeneland alone.  [*Id.*].  in his affidavit, Baffert testified that CDI's suspension will "effectively put [him] out of business."  [DE 5-21 at 294].   However, Baffert testified on February 3, 2023, that he had won races in Kentucky resulting in a $2 million purse. *See* Feb. 2–3, Hrg. Tr., 182:1–16. Moreover, Baffert admitted that he has continued to race horses around the world with enormous success. *See id.*   It is highly unlikely that the Court could find Baffert's trainer's license "valueless" when he has used it to earn millions of dollars in the Commonwealth of Kentucky while suspended from CDI racetracks. *See Med Corp.*, 296 F.3d at 413.

Next, Plaintiffs must also show they were not provided adequate process. *See West*, 972 F.3d at 890.   However, the relationship between the parties is governed by contract.  [DE 51-7; DE 51-8].   Baffert signed the Rules and Conditions for Racing and Training [DE 51-7] and the Stall Application [DE 51-8].   The Rules and Conditions for Racing and Training to abide by all "rules and regulations of the KHRC[.]"  [DE 51-7 at 3487].   The Stall Application further provides that

> [a] violation of the rules or regulations of the KHRC or the conditions, rules and
> regulations of Churchill or the creation, in whole or in part, by Trainer of any

> condition that may interfere with the safe and efficient operation of its business . . . shall, in each case, subject this license to immediate revocation exercised at Churchill's sole and exclusive discretion, without any prior notice.

[DE 51-8 at 3490]. Based on the Rules and Conditions for Racing and Training and the Stall Application, Plaintiffs were not entitled to process before CDI could impose a suspension. [*Id.*]. To the extent that Plaintiffs believe CDI violated the terms of their contract, such a cause of action is better suited for a claim of breach of contract under Kentucky law. *See Kaminski v. Coulter*, 865 F.3d 339, 347–48 (6th Cir. 2017).

Accordingly, Baffert has failed to demonstrate two of the three elements required for a due process violation. *See West*, 972 F.3d at 890. Because Plaintiffs have failed to show that CDI's suspension was state action, and because Plaintiffs have failed to prove a violation of due process, the Court finds that Plaintiffs cannot demonstrate a likelihood of success on the merits of their § 1983 claim. *See Overstreet*, 305 F.3d at 573. This factor weighs against injunctive relief.

### iii.    *Whether an Injunction Would Cause Others Substantial Harm*

Next, the Court must consider whether injunctive relief would harm others. *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542. While this factor is generally concerned with harm to third parties, courts also often consider the "balance of hardships" between the parties if an injunction were to issue. *See, e.g.*, *id.* at 550–51; *Nesco Res. LLC v. Walker*, No. 3:18-CV-00171-GNS, 2018 WL 2773321, at *5 (W.D. Ky. Apr. 23, 2018). Plaintiffs carry "the burden of justifying [the injunctive] relief" they seek. *Wilson v. Williams*, 961 F.3d 829, 837 (6th Cir. 2020).

If the Court were to issue an injunction, Baffert would be allowed to enter horses in the 2023 Kentucky Derby. Plaintiffs contend that Defendants would suffer no harm if the Court enjoined CDI's suspension. [DE 41 at 1394]. However, Defendants contend that an injunction

would harm the integrity of their races and harm third parties who have earned points toward the 2023 Kentucky Derby. [DE 50 at 3206]. As explained, Baffert is the only trainer whose horses have tested positive in back-to-back marquee races on CDI tracks. [DE 51 at 3239]. Failing to punish trainers whose horses test positive in marquee races could harm CDI's reputation and the integrity of their races. Moreover, trainers have already earned points towards the 2023 Kentucky Derby. [*Id.* at 3224]. If Plaintiffs' horses are allowed to race, then they would necessarily exclude those who would have otherwise qualified. [*Id.*]; *see also Robbins v. Kentucky High Sch. Athletic Ass'n*, No. CIV.A. 5:12-355-DCR, 2012 WL 6706168, at *6 (E.D. Ky. Dec. 26, 2012) (recognizing harm to a third-party athlete who would lose a spot on the team if the court gave plaintiff a roster spot). The Court finds that CDI and innocent third parties who have already earned points would be substantially harmed if the court imposed an injunction. Therefore, the substantial harm factor weighs against injunctive relief.

### iv. Whether Public Interest is Served by Issuance of Injunction

The final factor the Court must evaluate is "whether the public interest would be served by the issuance of the injunction." *Tenke*, 511 F.3d at 551. There is a strong public interest in deterring misconduct on CDI's tracks. Moreover, the Sixth Circuit has held that "[t]he public has a strong interest in holding private parties to their agreements." *Great Lakes Brewing Co.*, 860 F.3d at 853. Baffert signed the Rules and Conditions for Racing and Training [DE 51-7] and the Stall Application [DE 51-8]. Accordingly, the Court is inclined to hold the parties to their agreements. The Court finds that the public interest weighs against injunctive relief.

### C. Conclusion

As stated above, all four factors the Court is required to consider weigh against injunctive relief. *See Great Lakes Brewing Co.*, 860 F.3d at 849. Plaintiffs have failed to carry their burden

to demonstrate that the Court should impose a preliminary injunction against CDI's suspension. *See Overstreet*, 305 F.3d at 573. Accordingly, Plaintiffs' Renewed Motion for a Preliminary Injunction [DE 41] is **DENIED**.

## IV. CONCLUSION

For all these reasons, and the Court being otherwise sufficiently advised, **IT IS ORDERED** as follows:

(1)     Plaintiffs' Request for Leave to File Brief in Excess of 25 Pages [DE 37] is **GRANTED**;

(2)     Defendants' Motion to Dismiss [DE 36] is **GRANTED as to Counts 2-6 and DENIED as to Count 1**; and

(3)     Plaintiffs' Renewed Motion for a Preliminary Injunction [DE 41] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

February 17, 2023

Cc:     Counsel of record